******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

# INDOOR BILLBOARD NORTHWEST, INC., ET AL.
## *v.* M2 SYSTEMS CORPORATION
## (AC 39890)
## (AC 40558)

Keller, Elgo and Bright, Js.*

*Syllabus*

The plaintiff investors sought to recover damages from the defendant software developer for the wrongful transfer by J, their investment manager, of funds from their custodial accounts at a bank that were used to pay the defendant's loan obligation to S, who also held a custodial investment account at the bank. The plaintiffs and S had entered into investment-management agreements with T Co., which was managed by J. In 2006, J used funds from S's account as a source of the $2,050,000 loan that J had negotiated with M, the defendant's chief executive officer. The defendant obtained the loan to assist another company, I Co., of which M was president, in obtaining computer equipment. M, on behalf of the defendant, issued a promissory note to J that named S as the payee. The promissory note was secured by shares of stock in I Co. In 2007, the defendant ceased the services offered by I Co., which resulted in a decline in the defendant's business. M then negotiated with J an extension of the promissory note to 2010. The amendment to the promissory note was not signed. M testified at his deposition that he had never seen the document that amended the promissory note and was unaware that it had been amended. J thereafter directed the bank to wire funds from the plaintiffs' accounts to an escrow account that was maintained by T Co.'s attorney as payment for the defendant's assignment of subnotes that J created and the bank recorded in the plaintiffs' accounts in amounts equal to the funds taken from those accounts. The plaintiffs paid $1,848,000 for the subnotes. The defendant did not thereafter pay the plaintiffs. J was later convicted of various federal charges, including investor advisement fraud, in connection with certain accounts at the bank but not as to the defendant's subnotes. The plaintiffs thereafter brought this action in which they sought to recover, as assignees of the promissory note or under a theory of unjust enrichment, the amount that was removed from their accounts. The trial court rendered judgment for the plaintiffs on their unjust enrichment claim. The court credited deposition testimony by J that his use of the plaintiffs' funds had satisfied the defendant's obligation to S. The court rejected the plaintiffs' assignment theory of liability, reasoning that the documents at issue had been created for and signed solely by J, and that the assignment claim was based on J's veracity and the reliability of records he kept while he was committing financial fraud. The court also rendered judgment for L, who was not a plaintiff but who had a custody account agreement with a different bank and held a subnote in his favor that J had executed on behalf of T Co. The court thereafter denied the plaintiffs' motion for attorney's fees and expenses, and the defendant and the plaintiffs filed separate appeals with this court. *Held*:

1. The trial court improperly rendered judgment for L, as the plaintiffs' complaint did not allege that L had assigned to a plaintiff his interest in the subnote that J executed in his favor: the court denied the plaintiffs' pretrial motion to amend their complaint to reflect L's assignment and precluded evidence at trial of any claims related to L on the ground that he was not a party, which the defendant did not dispute, and, although there was some evidence concerning L before the court, such evidence did not confer jurisdiction on the court to render an enforceable judgment for L; accordingly, the portion of the court's judgment rendered in L's favor was vacated.

2. The defendant could not prevail on its claim that the trial court improperly rejected its special defense that it was entitled to a setoff for funds the plaintiffs received from collateral sources; although the defendant's claim for a setoff was intertwined with a motion for sanctions it had filed concerning its attempt to determine from the plaintiffs' tax returns if they had written off losses or received funds in connection with the

subnotes at issue, the defendant did not challenge the court's decision not to award it sanctions or its ruling that it could apply postjudgment for review of the tax returns of plaintiffs who received a monetary award; moreover, the defendant's assertion, which was not raised at trial, that the court could not properly consider the setoff issue without first permitting the defendant to review the tax returns, was unavailing, as the court was not persuaded that the defendant was entitled to unfettered access to the tax returns, the defendant failed to present evidence in support of its defense of setoff, none of the plaintiffs who testified at trial stated that they had recovered from a collateral source, and the defendant did not demonstrate that application to examine the plaintiffs' tax returns postjudgment was inadequate or that it pursued that potential relief.

3. The trial court did not abuse its discretion in rejecting the defendant's special defense of unclean hands, which was based on the defendant's assertions that the plaintiffs were tainted by J's fraud and had taken a different position in prior lawsuits they brought against the bank by challenging the validity of the assignments and subnotes: the claim that the plaintiffs took an inconsistent position with respect to the assignments and subnotes logically and legally pertained to their assignee cause of action, which the court rejected, and the defendant did not suggest, and the court did not find, that the defendant was a party in the prior lawsuits, in which the plaintiffs did not state claims against the defendant.

4. The trial court's factual finding that the promissory note had been amended was not clearly erroneous, there having been no basis to presume that the court improperly relied on an exhibit from M's deposition that had been precluded from evidence when the amendment to the note had been admitted into evidence as an exhibit from J's deposition; J's testimony that M both negotiated the amendment with him and at some point executed it provided an evidentiary basis for the court's finding, and, even if the finding was improper, the defendant could not demonstrate that it was harmful, as it was not integral to the court's analysis under a theory of unjust enrichment; moreover, to the extent that the defendant's payment obligations were relevant to a determination that it was aware of the note's existence and the defendant's obligations thereunder, there was evidence before the court that M was aware of the note and had written in an e-mail to J that the defendant would not default.

5. The defendant failed to demonstrate that the evidence did not support the trial court's finding that the plaintiffs were entitled to recover under a theory of unjust enrichment: contrary to the defendant's assertion that it was not benefited by the disbursement of the plaintiffs' funds because the plaintiffs lacked knowledge of how the funds were used and produced no evidence that S received payments from the plaintiffs, J testified that S had been repaid in full, and M testified that the defendant benefited when it used the loan proceeds to purchase hardware for I Co.; moreover, despite the defendant's claim that the plaintiffs failed to prove that it unjustly did not pay them for the benefit it received, which was based on its assertion that the plaintiffs did not justly obtain an interest in the promissory note and that the subnotes were mere IOU's from T Co. that obligated the defendant to pay T Co. rather than the plaintiffs, the court did not award the plaintiffs a remedy as legal assignees and subrogees but under the unjust enrichment doctrine; furthermore, the defendant's claim that the plaintiffs did not prove that the failure of payment to them was to their detriment was undermined by J's testimony that the proceeds of the promissory note plus interest were repaid to S in part by virtue of the funds that were deducted from the plaintiffs' accounts, over which T Co. exercised control.

6. This court declined to reach the merits of the defendant's inadequately briefed claim that the trial court erred in finding that the defendant was unjustly enriched as a result of J's cross-trading of subnotes in and among the plaintiffs' accounts; the defendant did not demonstrate that the cross-trading undermined the court's finding that funds removed from the plaintiffs' accounts were used to repay the defendant's debt to S, as the defendant's one sentence conclusory statement of its claim in its brief was unsupported by analysis or citation to authority.

7. The trial court's finding that the defendant's loan obligation to S was satisfied in part with the use of the plaintiffs' funds was not clearly erroneous: despite the defendant's claims of technical defects in the

manner in which J's telephonic deposition occurred, J's deposition testimony, which supported the court's finding, was admitted into evidence without limitation, and the defendant did not demonstrate that the court misconstrued or drew improper inferences from it, as the court's finding was not inconsistent with its decision not to credit J's version of the events at issue and to reject the defendant's claim that the plaintiffs were assignees of the subnotes; moreover, the court was free to reject the portions of J's testimony that would have supported the defendant's assignee claim while relying on J's testimony that supported the plaintiffs' claim for equitable relief, as the plaintiffs, to be entitled to equitable relief, did not need to prove the legal validity of the instruments at issue but, rather, that their funds had been used to partially satisfy the defendant's debt to S.

8. The defendant could not prevail on its claim that the trial court erred in finding that the plaintiffs satisfied the defendant's debt to S despite their failure to produce evidence of a written discharge of the promissory note; the defendant did not cite authority to show that the plaintiffs had the burden of proving that their repayment of the debt thereafter caused S to discharge the note in writing, the evidence supported the court's finding that the plaintiffs funds were used to pay the defendant's debt to S, and the plaintiffs' lack of satisfaction of the note's technical requirements was of no consequence as to whether funds removed from their accounts benefited the defendant.

9. The trial court properly denied the plaintiffs' postjudgment motion for attorney's fees and expenses, the plaintiffs having failed to demonstrate that, as a matter of law, they had a right to attorney's fees because they prevailed under the equitable theory of unjust enrichment and stood in the shoes of S as equitable subrogees with respect to S's right to recover attorney's fees under the promissory note: although the plaintiffs could have sought to enforce the note's provision for attorney's fees had the court found that they were assignees of the note, the court did not find that they obtained contractual or quasi-contractual rights to enforce the note against the defendant and properly distinguished between finding that the elements of unjust enrichment had been proven and that the plaintiffs had stepped into S's shoes as a result of their partial payment of the defendant's debt to S; moreover, the plaintiffs provided no binding authority in support of their claim that attorney's fees are a necessary component of an award in which a party has unjustly enriched another by payment of a debt.

Argued December 9, 2019—officially released January 12, 2021

*Procedural History*

Action to recover on a promissory note, and for other relief, brought to the Superior Court in the judicial district of Fairfield, where the court, *Bellis, J.*, denied the plaintiffs' motion to add a plaintiff and to amend the complaint; thereafter, the matter was tried to the court, *Hon. George N. Thim*, judge trial referee; subsequently, the court, *Hon. George N. Thim*, judge trial referee, denied the defendant's motion for sanctions; judgment in part for the plaintiffs, from which the defendant appealed to this court; thereafter, the court, *Hon. George N. Thim*, judge trial referee, denied the plaintiffs' motion for attorney's fees, and the plaintiffs appealed to this court. *Affirmed in part; reversed in part; judgment directed.*

*Bradley A. Bell*, pro hac vice, with whom were *Scott M. Harrington* and, on the brief, *Philip A. Beach*, pro hac vice, for the appellant in Docket No. AC 39890 and the appellee in Docket No. AC 40558 (defendant).

*Arden E. Shenker*, pro hac vice, with whom was *John Robacynski*, for the appellees in Docket No. AC 39890 and the appellants in Docket No. AC 40558 (plaintiffs).

*Opinion*

KELLER, J. The action underlying these appeals was brought by twenty-three plaintiffs who are the victims of a fraudulent loan scheme that was created and carried out by the former manager of their custodial investment accounts.[1] The plaintiffs sought to recover from the defendant, M2 Systems Corporation, the funds wrongfully transferred from their accounts by the manager of the accounts. They sought to recover either by virtue of their rights as partial assignees of a promissory note that had been executed by the defendant in favor of a third party or under a theory of unjust enrichment. Following a trial to the court that lasted five days, the court rejected the plaintiffs' attempt to recover damages as assignees of the note at issue but agreed with the plaintiffs that they were entitled to recover damages under a theory of unjust enrichment. The court awarded the plaintiffs $2,494,800, which included the amount wrongfully transferred from each plaintiff's investment account, as well as prejudgment interest.[2]

In Docket No. AC 39890, the defendant appeals from the judgment of the trial court with respect to the unjust enrichment cause of action brought by the plaintiffs. The defendant claims that the court erred in the following ways: (1) by awarding damages to a person who was neither a plaintiff in the underlying action nor a nonparty who had assigned his interest to a plaintiff in the underlying action; (2) by determining that the defendant was not entitled to a setoff; (3) by rejecting its special defense of judicial estoppel; (4) by finding that the note executed by the defendant in favor of a third party had been amended; (5) by finding that the defendant had been unjustly enriched as a result of the plaintiffs' funds; (6) by finding that cross-traded subnotes, which had been exchanged between some of the plaintiffs' accounts, had unjustly enriched the defendant; (7) by finding that the defendant's loan obligation to a third party was satisfied in part with the use of the plaintiffs' funds; and (8) by finding that the plaintiffs had satisfied in part the defendant's debt obligation to a third party despite the fact that the debt was not discharged pursuant to the terms of the note at issue.

Docket No. AC 40558 is the plaintiffs' appeal from the court's decision denying their postverdict motion for attorney's fees. In their appeal, the plaintiffs claim that the court erred by denying their motion for attorney's fees and expenses after rendering judgment in their favor with respect to their unjust enrichment cause of action. We agree with the first claim raised by the defendant in Docket No. AC 39890 and, consequently, reverse the portion of the judgment that is the subject of that claim. With respect to the remainder of the claims raised by the defendant in Docket No. AC 39890 and the claim raised by the plaintiffs in Docket No. AC

40558, we affirm the judgment and the decision of the trial court.

In its memorandum of decision filed November 23, 2016, the court aptly summarized the relevant procedural history of the case, including the nature of the plaintiffs' causes of action and the defendant's defenses, and set forth the facts and legal bases of its decision. The court began its decision as follows: "The plaintiffs contend [that] they are partial assignees of a promissory note issued by [the] defendant . . . and seek to recover $3,848,000 from [the defendant] under the terms of the note. In the alternative, should the plaintiffs' claims as assignees fail, the plaintiffs seek to recover from [the defendant] on an unjust enrichment theory. They claim [that] their funds were used to pay [the defendant's] loan obligation. The defendant . . . contends [that] the plaintiffs have failed to prove their claims. [The defendant] posits [that] the plaintiffs are victims of their financial advisor's fraudulent conduct. [The defendant] raises various special defenses. For the reasons stated [in this memorandum of decision], this court [renders] judgment for the plaintiffs."

The court next set forth the following findings: "There are twenty-three plaintiffs in this lawsuit. Each held investments in custodial accounts that were maintained with the wealth and services division of [the] State Street Bank and Trust Company [bank].[3] Each plaintiff entered into an account agreement with the bank that stated [that] Tauris Advisory Group, LLC (TAG), was the account owner's agent and authorized investment manager. Each plaintiff also entered into investment-management agreements with TAG. The TAG agreements stated that TAG was the plaintiffs' agent and authorized investment manager.

"TAG, as well as its successor, TAG Virgin Islands, Inc., was managed by James Tagliaferri, who was a principal in the two financial service companies. TAG at one time maintained offices in Stamford . . . . The effect of the plaintiffs' agreements with [the bank] and TAG was to give Tagliaferri carte blanche authority over the plaintiffs' investment accounts at [the bank].

"Tagliaferri had other clients who are not parties to this lawsuit. One of those clients was Matthew J. Szulik. Szulik maintained a custodial account with [the bank]. His agreement with the bank, like the plaintiffs' agreements, provided that Tagliaferri was his agent. Szulik's investment-management agreement with TAG, like the plaintiffs' agreements, provided that TAG was his authorized investment agent.

"In July of 2006, Tagliaferri arranged for Szulik's investment account with [the bank] to be used as a source of a loan to [the] defendant . . . . Tagliaferri negotiated the loan over the telephone with the chief executive officer of [the defendant], Michael Muscato.

Szulik did not participate in the telephonic negotiations.

"[The defendant] develops and sells software that integrates computer systems. At the time of the loan to [the defendant] . . . Muscato, in addition to his position as chief executive officer of [the defendant], was president of another company, IQ-Ludorum, Plc (IQL). [The defendant] obtained the loan so that it could assist IQL in obtaining computer equipment. IQL was pursuing a business venture that involved providing 'offshore' services to gamblers. [The defendant] designed IQL's computer system and provided maintenance and support services at IQL's data center in Antigua. IQL's stock was traded on a stock exchange in London, England.

"The loan to [the defendant] was evidenced by a promissory note for $2,050,000 signed on behalf of [the defendant] by . . . Muscato. The note is dated July 25, 2006. In the document, [the defendant] promises to pay . . . Szulik, payee, on April 24, 2007, the principal amount of $2,050,000. The note provides for the prepayment of interest at a rate of 12 percent per annum. The interest prepayment amounted to $184,500 and was deducted from the loan amount. Thus, $1,865,500 was advanced from Szulik's account. The note was secured by shares of IQL stock and an equipment lease with J.P. Morgan Electronic Financial Services, Inc. At [the defendant's] direction, the loan proceeds ($1,865,500) were forwarded to an escrow account and thereafter distributed in accordance with the terms of the note and a security agreement.

"The records for Szulik's custodial account with [the bank] indicate that in 2006, Szulik held a note designated as 'Prom NTM2 Sys Corp 12% 4/27/07 valued at $2,050,000 USD.' The bank's records further indicate that, on February 26, 2009, the note, using the bank's term, was 'distributed' from Szulik's account.

"In 2007, according to Muscato, Congress passed a law banning United States citizens from using the gambling services that IQL was offering. [The defendant] decided to stop its gambling venture, which decision put [the defendant's] business 'on the skids.' Muscato negotiated with Tagliaferri for an extension of the note. In August of 2007, the note was extended to February 23, 2010. [The defendant] paid an extension fee of $205,000 and, in addition, paid $45,000 for interest that had accrued between the original due date, April 24, 2007, and the date of the fee payment.

"According to Tagliaferri, the [defendant's] note was amended by a document dated April 24, 2007. The purported amendment changed the section . . . [of the original note that pertained to] interest and repayment of principal. The purported amendment requires [the defendant] to 'pay [i]nterest on the [p]rincipal accruing on and after April 24, 2007, on the first full day of each month commencing on July 1, 2007 until the [o]bliga-

tions are paid in full.' The typed document has lines for the signatures for . . . Muscato on behalf of [the defendant] and . . . Tagliaferri on behalf of TAG as agent for Szulik. The copy in evidence is not signed. . . . Muscato, as of the date of his deposition on August 14, 2015, had never seen the document amending the note and was not aware the note had been amended.

"Tagliaferri, in 2009 and 2010, directed [the bank] to wire funds from the plaintiffs' . . . accounts [at the bank] to an escrow account maintained by TAG's attorney. TAG advised the bank that the funds were being used as payment for . . . corporate notes or subnotes [of the defendant]. These transactions were described by [the bank] in the plaintiffs' statements as 'cash disbursement . . . for assignment of M-2 Note' or 'cash disbursement . . . wire for M2 Note.' The bank's statements further recorded assets received in exchange for these funds as 'M2 Systems Corp Notes 12% 2/23/10' or 'M2 Systems Corp 12% Sub Nt.' The bank recorded asset values in each account for [the defendant's] notes or subnotes in an amount equal to the amount transferred from the accounts at Tagliaferri's direction. Some accounts had more than one transaction with respect to the [defendant's] notes. A review of the transactions also indicates that there was some cross-trading of the 'subnotes' between the plaintiffs' accounts.

"In February of 2011, one of the plaintiffs asked Tagliaferri by way of e-mail, 'Can you explain what is going on with the M2 System notes I hold in my personal portfolio . . . ?' Tagliaferri replied, 'Expect to get paid.'

"In June of 2012, [the bank], in response to requests made by individual plaintiffs, mailed to the plaintiffs documents that purported to represent their ownership interests in the [defendant's] note. These documents are titled 'M2 SYSTEMS CORPORATION 12% SECURED SUBNOTE.' In the body of each document, TAG promises to pay a specified amount 'upon payment by M2 . . . of the note . . . .' Many of the documents do not name the person or entity TAG promises to pay but contain a space where a name has been redacted. [The bank], in its June letters to individual plaintiffs, provided a copy of a 'subnote' and specified the respective plaintiff's 'portion' of the subnote. For example, exhibit 14 is a letter to [the] plaintiff Geoffrey W. Holmes. Attached to the letter is a 'subnote' for $725,000. The name of the payee is redacted. In its letter, the bank reports that [Geoffrey W. Holmes'] 'portion' of the note is $125,000. The subnotes were drafted by TAG or TAG's attorney. They are signed by Tagliaferri as agent for TAG. No one else's signature appears on the documents.

"The plaintiffs as a group paid TAG $1,848,000 for what was represented by Tagliaferri to be for [the defendant's] 'subnotes.' The plaintiffs seek to recover from [the defendant] the amount removed from their bank

accounts together with interest, computed at 12 percent from November 6, 2009, to August 19, 2016, for a grand total of $3,335,968. [The defendant] acknowledges that it has not made any payments on the note since April of 2007." (Citation omitted; footnote added.)

The court then summarized what it deemed to be relevant prior litigation related to the conduct at issue in the plaintiffs' causes of action. The court stated: "Many of the plaintiffs, starting in 2012, sued [the bank] and . . . Tagliaferri in connection with the subnotes issued by Tagliaferri. . . .

"On May 1, 2012, Donald J. Handal, a plaintiff in the present lawsuit, filed a consolidated class action complaint in the United States District Court, District of Massachusetts, against [the bank]. Handal alleges, inter alia, [that] '[t]he subordinated notes for TAG are fake on their face. The subordinated notes are no more than IOUs issued by TAG to plaintiffs and class members. They are fake and entirely unsubstantiated representations of an investment in notes of the company. In short, they were created out of whole cloth . . . . Copies of several of these fake subordinated notes are attached hereto as exhibit A.' Attached to the complaint as part of exhibit A is a copy of the subnote that . . . Handal is attempting to enforce in the present litigation. It is representative of the notes that the other plaintiffs are attempting to enforce. . . .

"On October 24, 2012, Alan [Wolff] and Nadine Wolff, plaintiffs in the present lawsuit, filed an action for fraud against [the bank] and . . . Tagliaferri in the United States District Court, District of Massachusetts. They allege in paragraph 40 of their complaint, inter alia, [that] '[i]n December, 2009, Tagliaferri instructed [the bank] to wire $100,000 out of [the] plaintiffs' account . . . for the purchase of an "M2 Sys Corp Note 12% 2/23/10." The account entry . . . led the plaintiffs to believe that . . . [the note] was issued by [the defendant] . . . as the obligor . . . . [The defendant] wasn't the obligor on the note. Tagliaferri as the president of TAG, was the sole obligor, and he promised to pay the $100,000 in question to his own customer as soon as Tagliaferri was paid back the amount by [the defendant].' The plaintiffs allege in paragraph 117 of the complaint that TAG 'was engaging in extensive cross-trading in the same securities in the accounts of [bank] customers, which necessarily sacrificed one [bank] customer's interest in favor of another [bank] customer . . . .'

"On October 24, 2012, Michael Wolff, a plaintiff in the present lawsuit, filed an action for fraud against [the bank] and . . . Tagliaferri. Michael Wolff made similar allegations to those quoted in the [previous] paragraph. . . .

"On November 9, 2012, Catherine E. Cox, a plaintiff

in the present lawsuit, filed a complaint against [the bank] and . . . Tagliaferri alleging fraud and other misconduct. She, like Alan [Wolff] and Nadine Wolff, alleged a misrepresentation as to the obligor on a note listed in her account as 'M2 Sys Corp Notes 12% 2/23/10.' She further alleged, in paragraph 125 of her complaint, that '[the] [p]laintiff's reliance upon Tagliaferri's fraudulent representations and conduct permitted Tagliaferri and/or TAG to continue with their activities and to carry out their frauds resulting in most of the securities held in [the] [p]laintiff's [bank] account to become totally worthless.' . . .

"On June 5, 2013, Kay M. Kazmaier, a plaintiff in the present lawsuit, filed a complaint against [the bank] and . . . Tagliaferri in the United States District Court, District of Massachusetts. Kazmaier, like the [previously mentioned] plaintiffs, alleged that Tagliaferri, as the president of TAG, was the sole obligor on a note labeled 'M2 Sys Corp Notes 12% 2/23/10' and that he promises to pay the sum in question to his own customer as soon as Tagliaferri was paid back by [the defendant]. She also alleged that Tagliaferri engaged in extensive cross-trading in the same stocks in customer accounts. . . .

"On August 15, 2013, the Handal lawsuit was settled. The settlement agreement encompassed the owners of fifty-one custodial accounts. The account owners included some of the plaintiffs in the present lawsuit. On December 6, 2013, the A. Wolff lawsuit, M. Wolff lawsuit, Kazmaier lawsuit and Cox lawsuit were settled. The settlement agreement encompassed lawsuits and claims made by the owners of forty-seven custodial accounts. The participants included some plaintiffs involved in the present lawsuit.

"[Steven Goldin and Rochelle Goldin, who are] plaintiffs in the present lawsuit, filed a complaint in the Supreme Court of the state of New York, county of New York, alleging investor fraud and other misconduct against TAG Virgin Islands, Inc. . . . Tagliaferri, his wife, Patricia Cornell, and others. In an amended complaint filed on October 22, 2014, the Goldins allege in paragraph 69 [that], '[i]n mid-2007, Cornell and Tagliaferri, through TAG, began defrauding [the] plaintiffs by liquidating their conservative investments and transferring [the] plaintiffs' funds to TAG-affiliated companies under the pretense of convertible note instruments. These notes were an illusory fiction designed by Cornell and Tagliaferri to defraud the plaintiffs, and other customers.' In paragraph 70 of their amended complaint, they refer to the notes as 'sham notes.' . . .

"On July 24, 2012, the plaintiffs in the present lawsuit filed a lawsuit against [the defendant] in the United States District Court, District of Oregon, Portland Division. The case was dismissed on the ground that it was brought in the wrong venue. The [defendant's] note

provides that suit must be brought in Connecticut. The plaintiffs in 2013 initiated the lawsuit that is presently before this court.

"[Szulik], who is not a party in the present lawsuit, sued Tagliaferri for $60 million in damages. There is no evidence that Szulik's lawsuit against Tagliaferri involved the [defendant's] note. The suit was settled without any payment by Tagliaferri to Szulik or payment by Szulik to Tagliaferri on the latter's counterclaim."

The court also described an earlier federal criminal prosecution that had been brought against Tagliaferri. The court stated: "On February 19, 2013 . . . Tagliaferri was indicted in the United States District Court, Southern District of New York. The federal criminal trial concerned, in part, Tagliaferri's misconduct with his clients' . . . accounts [at the bank]. While the federal indictment did not contain allegations concerning the [defendant's] 'subnotes,' a plaintiff in the present lawsuit . . . Handal, testified at the criminal trial about the M2 'subnotes.' A jury found Tagliaferri guilty on twelve counts involving allegations of investment advisor fraud, securities fraud, wire fraud, and violation of the Travel Act, 18 U.S.C. 1952 (2012). On February 13, 2015, Tagliaferri was sentenced to imprisonment for a term of seventy-two months."

The court began its analysis of the plaintiffs' two causes of action as follows: "The plaintiffs' claims are dependent on documents prepared by TAG's attorney and signed by Tagliaferri. These documents are the 'subnotes,' discussed [previously], two 'assignment' documents, and Tagliaferri's account records. One of the 'assignment' documents is dated February 24, 2009, and is titled 'Assignment of Note.' The other is dated November 6, 2009, and is titled 'Note Assignment Agreement.' Tagliaferri is the only person who signed these documents. He signed in two capacities: as agent on behalf of the assignor, Szulik, and as agent on behalf of unnamed assignees. . . .

"In the present lawsuit, the plaintiffs, after setting forth background allegations of fact in part A of their complaint, set forth in parts B and C [of their complaint] their theories of recovery. Part B is titled 'Collection Allegations.' Part C is titled 'Unjust Enrichment Allegations.' To the extent [that] the plaintiffs rely on the contention [that] they are assignees of the [promissory note that the defendant executed in favor of Szulik], this court finds the issues in favor of [the] defendant . . . . The assignment claims are dependent on the veracity of Tagliaferri and the reliability of records kept by him while he was committing financial fraud. The 'assignment' documents were created for and signed solely by Tagliaferri. Tagliaferri, as discussed [previously], was recently convicted of felonies involving such a degree of turpitude in their commission that one cannot readily accept his version of events. Indeed,

some of the plaintiffs, in recent lawsuits, attacked his veracity and described the transactions in their accounts as fake and created out of whole cloth.

"To the extent [that] the plaintiffs rely on an unjust enrichment claim, this court finds the issues in favor of the plaintiffs. The evidence, including a part of Tagliaferri's deposition testimony that this court credits, is that [the defendant's] obligation to Szulik was satisfied with Tagliaferri's use of the plaintiffs' funds. The plaintiffs, as a group, paid $1,848,000 on [the defendant's] obligation to Szulik.[4] Each plaintiff's contribution or payment is set forth . . . [in detail] in this memorandum [of decision]. Despite demand, as evidenced by the plaintiffs' lawsuit filed in Oregon on July 24, 2012, [the] defendant . . . has failed to pay the plaintiffs, to their detriment."[5] (Footnote added.)

Having determined that the plaintiffs were entitled to relief with respect to their unjust enrichment cause of action, the court addressed the defendant's special defenses: "[The defendant] filed special defenses on August 20, 2014 . . . . On May 24, 2016, [the defendant] moved to amend its special defenses . . . . [The defendant's] motion to amend was denied after the plaintiffs objected. The governing document . . . contains sixteen special defenses. [The defendant] now relies on the third, sixth, tenth, fourteenth, and fifteenth special defenses. It has abandoned the other special defenses.

"In the third special defense, [the defendant] alleges [that] the note may not be enforced because the original payee and his assigns, and the escrow agent, breached the escrow agreement. In a posttrial brief, [the defendant] argues that the IQL shares were not retained. The evidence does not support this claim. Moreover . . . Muscato, chief executive officer of [the defendant], testified by way of deposition that the shares had become worthless. He had no knowledge of facts that would support this defense.

"In the sixth special defense, [the defendant] alleges [that] the original payee of the note, and his agents and assigns, failed to maximize the collateral. Muscato testified that IQL went out of business and [that] the computer equipment soon became out-of-date and worthless. The evidence does not support this claim.

"In the tenth special defense, [the defendant] alleges [that] the plaintiffs' claims must be barred on the theory [that] the plaintiffs are tainted by Tagliaferri's fraud. [The defendant] further argues that the plaintiffs must be barred because they asserted in other lawsuits that the 'subnotes' were invalid. Neither Tagliaferri's fraud nor the plaintiffs' claims in other lawsuits invalidates or bars the plaintiffs' present claims.

"In the fourteenth special defense, [the defendant] alleges [that] 'the attempted assignment of the subject

note . . . does not comply with the requirements of a valid assignment.' In the fifteenth special defense, [the defendant] alleges [that] 'the attempted assignment . . . is unenforceable, as the purported assignor had no authority to assign the subject note at the time of the assignment.' These defenses are inapplicable since the court is awarding damages on an unjust enrichment theory, not on a contract theory."[6] (Citations omitted.)

Having rejected the special defenses on which the defendant relied, the court turned to its award of damages. The court stated: "Based on the foregoing, the court concludes that the plaintiffs should be awarded, collectively, $1,848,000. The court further concludes that an award of prejudgment interest at the annual rate of 8 percent per year is fair and equitable. Since [the] defendant . . . was clearly put on notice of the plaintiffs' claims at the time [that] the plaintiffs filed their Oregon lawsuit on July 24, 2012, this court concludes [that] this date is appropriate for the commencement of the period for computing prejudgment interest. Interest is computed from that date to the date of judgment, November 23, 2016. The court finds that each plaintiff contributed toward the payment of [the defendant's] obligation to Szulik . . . . Each plaintiff is awarded that amount together with prejudgment interest." The total award, consisting of principal and interest, was $2,494,800.[7] From this judgment, the defendant brought the appeal in Docket No. AC 39890. Thereafter, the plaintiffs filed a motion for attorney's fees and expenses, which the court denied.[8] From the judgment denying their motion for attorney's fees and expenses, the plaintiffs brought the appeal in Docket No. AC 40558. Additional facts and procedural history will be set forth as necessary.

I

THE DEFENDANT'S APPEAL

A

The defendant's first claim is that the court erred by awarding damages to a person who was neither a plaintiff in the underlying action nor a nonparty who had assigned his interest to a plaintiff in the underlying action. We agree.

As explained previously in this opinion, the court awarded Douglas Lamm $100,000 in damages as well as $35,000 in prejudgment interest. See footnotes 2 and 7 of this opinion. The court noted that this was an "Assigned Claim" of the named plaintiff, Indoor Billboard Northwest, Inc. Id. In its November 23, 2016 memorandum of decision, the court did not address separately the basis of its award in favor of Lamm. The defendant, however, subsequently sought articulation with respect to the legal and factual basis of the award. Although the court denied the motion for articulation, this court later granted the defendant's motion for

review of the trial court's denial and ordered the trial court to articulate with respect to the award in Lamm's favor. In its articulation, the court summarily stated the basis for its award as follows: "Exhibit 8—Tabs 97, 105–106, 111; Exhibit 9, Tab 113."

Our review of the record reflects that exhibit 8, at tab 97, reflects a "Custody Account Agreement," dated January 30, 2001, that was entered into between Lamm and Chase Manhattan Bank. Exhibit 8, at tabs 105–106, reflects bank account statements for Lamm from the bank in November and December, 2009. The court referred, as well, to exhibit 9, which was an exhibit marked for identification and, thus, not part of the evidence. Exhibit 9, at tab 113, reflects a subnote executed by Tagliaferri on behalf of TAG in favor of Lamm in the amount of $100,000. The record reflects that the defendant objected to the admission of exhibit 9 on relevancy grounds, specifically, by arguing that Lamm was not a plaintiff in this case and [that] the court previously had not permitted the plaintiffs to amend their complaint for the purpose of alleging that Lamm had assigned his claim to Indoor Billboard Northwest, Inc. The court sustained the defendant's objection.

The record reflects that Lamm was not a party to the underlying action. By motion filed February 3, 2016, the plaintiffs sought to add an additional plaintiff, Karen Taragano, to the action, and sought permission for leave to amend the substituted complaint, pursuant to Practice Book § 10-60 (a) (3), so as to add "an assignment by Douglas Lamm to plaintiff Indoor Billboard Northwest, Inc., of his interest in a subnote. His subnote is similar to the ones purchased by the existing plaintiffs. The issues involved in regard to his subnote are the same as exist in regard to the subnotes of the existing plaintiffs." The defendant objected to the motion. The court, *Bellis*, *J.*, denied the plaintiffs' motion to amend their substituted complaint to reflect that Indoor Billboard Northwest, Inc., had been assigned Lamm's interest in one of the subnotes at issue in the underlying action.

Also, the record reflects that, during the trial, the court generally precluded evidence related to any claims related to Lamm. During the plaintiffs' examination of Mel Shulevitz, the president of Indoor Billboard Northwest, Inc., the plaintiffs' attorney inquired about payments that were made to Lamm. The defendant objected, in part, on the ground that Lamm was not a plaintiff. After the court sustained the defendant's objection, the plaintiffs elicited testimony that Lamm had assigned his claim to Indoor Billboard Northwest, Inc., and that he had not received any payment related to the subnotes at issue in this case. The defendant's attorney once more objected to the inquiry on the ground that Lamm was not a plaintiff. The plaintiffs' attorney responded that, although Lamm was not a plaintiff, he was "an assignor of the claim." After the

defendant's attorney advised the court that such facts were not alleged in the substituted complaint, the operative pleading, the court sustained the objection, and the plaintiffs' attorney ended the inquiry.

Although the defendant frames the claim as warranting review under the clearly erroneous standard of review, the claim implicates the jurisdiction of the trial court and presents a question of law. "A challenge to the jurisdiction of the trial court presents a question of law over which our review is plenary. . . . The jurisdiction of the trial court is limited to those parties *expressly named in the action coming before it*." (Citation omitted; emphasis in original; internal quotation marks omitted.) *Selby* v. *Building Group, Inc.*, 129 Conn. App. 599, 603, 19 A.3d 1289 (2011). "[A] court has no jurisdiction over persons who have not been made parties to the action before it." (Internal quotation marks omitted.) *Windels* v. *Environmental Protection Commission*, 284 Conn. 268, 280, 933 A.2d 256 (2007).

The record reflects, and the parties do not dispute, that Lamm was not expressly named in the action before it. The plaintiffs argue that because, without objection, they introduced *some* evidence pertaining to Lamm, the court properly rendered judgment in his favor. Simply put, such evidence did not confer jurisdiction on the trial court to render an enforceable judgment in favor of a nonparty, Lamm, against the defendant. Because the judgment is not enforceable, the remedy to which the defendant is entitled is that we vacate that portion of the judgment.

The plaintiffs argue, as well, that the court properly rendered judgment in favor of Lamm because he had assigned his claim to a party, Indoor Billboard Northwest, Inc., which presented the claim at trial. The plaintiffs, however, were limited to the allegations set forth in their substituted complaint, which is devoid of any reference to Lamm's claim or to an assignment related thereto. "Pleadings have an essential purpose in the judicial process. . . . For instance, [t]he purpose of the complaint is to put the defendants on notice of the claims made, to limit the issues to be decided, and to prevent surprise. . . . [T]he concept of notice concerns notions of fundamental fairness, affording parties the opportunity to be apprised when their interests are implicated in a given matter. . . . Whether a complaint gives sufficient notice is determined in each case with reference to the character of the wrong complained of and the underlying purpose of the rule which is to prevent surprise upon the defendant. . . .

"[I]t is imperative that the court and opposing counsel be able to rely on the statement of issues as set forth in the pleadings. . . . [A]ny judgment should conform to the pleadings, the issues and the prayers for relief. . . . [A] plaintiff may not allege one cause of action and recover upon another. . . . The requirement that

claims be raised timely and distinctly . . . recognizes that counsel should not have the opportunity to surprise an opponent by interjecting a claim when opposing counsel is no longer in a position to present evidence against such a claim. . . .

"[G]enerally . . . the allegations of the complaint provide the measure of recovery, and . . . the judgment cannot exceed the claims pleaded, including the prayer for relief. . . . These requirements . . . are based on the principle that a pleading must provide adequate notice of the facts claimed and the issues to be tried. . . . The fundamental purpose of these pleading requirements is to prevent surprise of the defendant. . . . The purpose of these general pleading requirements is consistent with the notion that the purpose of specific pleading requirements . . . is to promote the identification, narrowing and resolution of issues before the court. . . .

"[A]n equitable proceeding does not provide a trial court with unfettered discretion. The court cannot ignore the issues as framed in the pleadings." (Citations omitted; internal quotation marks omitted.) *Lynn* v. *Bosco*, 182 Conn. App. 200, 214–16, 189 A.3d 601 (2018); see also *Watson Real Estate*, *LLC* v. *Woodland Ridge*, *LLC*, 187 Conn. App. 282, 298, 202 A.3d 1033 (2019). Here, the pleadings, on which the defendant had a right to rely, did not set forth a claim or an assigned claim related to Lamm. As we have observed, the court, *Bellis*, *J.*, expressly disallowed an amendment to the complaint to raise such a claim.

Moreover, as we have explained previously, the court expressly sustained the defendant's objections to certain evidence concerning Lamm on the ground that Lamm was not a party. As the defendant argues, to the extent that there was some evidence or testimony concerning Lamm before the court, it did not challenge such evidence because it did not have notice of the claim or information concerning the claim during the discovery process.

In light of the foregoing, it was improper for the court to have rendered judgment in favor of Lamm. Moreover, the plaintiffs have not demonstrated that the court properly considered the claim to have been pursued on Lamm's behalf by Indoor Billboard Northwest, Inc. Accordingly, the defendant is entitled to a remedy, and the portion of the judgment rendered in Lamm's favor is ordered vacated.

### B

The defendant's next claim is that the court erred in determining that it was not entitled to a setoff. We disagree.

The following additional facts are relevant to this claim. As the court observed in its articulation dated September 27, 2017, the defendant, by way of its nine-

teenth special defense, claimed a right to a setoff for funds received from any collateral source. The defendant alleged: "[The] defendant is entitled to a setoff to the extent [of] all moneys received by or on behalf of [the] plaintiffs from any collateral source, including but not limited to, any settlement or court-ordered criminal restitution." The court rejected the defense on the ground that there was "no evidence that any settlement funds received in connection with other lawsuits were allocated to the [defendant's] subnotes."

On appeal, the defendant does not argue that the court's finding with respect to settlement funds is clearly erroneous. Indeed, our review of the evidence supports the court's finding that none of the plaintiffs received any funds from any collateral source in connection with the moneys withdrawn from their accounts related to the notes or subnotes at issue in this case.

The basis of the defendant's claim is that, under the circumstances of the present case, it would be unjust for this court "not to remand this issue for further proceedings to allow [the defendant] to properly prove its affirmative defense of setoff." At the heart of this claim of error is a discovery dispute. In its analysis of the claim, the defendant correctly observes that, on the first day of trial, the defendant's attorney informed the court that there was an outstanding motion for sanctions related to a discovery issue that had not been resolved between the parties. The defendant's attorney stated that, pursuant to settlement agreements, the bank had already paid the plaintiffs "in the neighborhood of four and a half million dollars." The defendant's attorney stated that the defendant attempted through discovery to obtain information concerning the plaintiffs' tax returns, specifically, whether the plaintiffs had written off losses in connection with the notes or subnotes at issue in the present case as bad investments and whether they had received any settlement funds from the bank related to such notes or subnotes. The defendant's attorney observed that the issue concerning tax returns had been raised before the court, *Hon. William B. Rush*, judge trial referee, several weeks earlier. On May 13, 2016, Judge Rush stated: "As far as the tax returns . . . [the defendant is] not entitled, and I don't think [it claims] to be entitled to . . . get the whole tax returns and see what's in them. [It is] entitled to receive any information about funds received in settlement from [the bank]. [The defendant is] also entitled to any line items that relate to fraudulent deductions or credit for fraudulent investments or schedules relating to that. So, they are entitled to that."

The plaintiffs' attorney acknowledged before the trial court that Judge Rush had asked him to "obtain and review the tax returns [of the plaintiffs] to determine if the tax returns show the amount of income received from [the bank] and any other fraud or theft losses

taken [in connection with claims raised against the defendant]. I did that, as an officer of the court, which was what Judge Rush intended. I responded that the tax returns which I reviewed have no income attributable to [the bank]. . . .

"[I]t is quite clear from looking at the tax returns, as I did, it's easy to look for the losses for theft or fraud and see what was taken. Not only was there none taken as to [the defendant], which was the request made of me, there was simply none taken at all, and I so reported."[9]

The plaintiffs' attorney stated that, although the plaintiffs had received funds in settlement from the bank, such funds were not related to the claims that they were bringing against the defendant in the present action. The plaintiffs' attorney informed the court that he had agreed to provide a list of such settlement funds to the defendant and that he would make such list available to the court, as well. The record is silent with respect to whether the list was produced.

The defendant's attorney asked the court to continue the trial so as to permit the plaintiffs' tax returns to be reviewed by an independent third-party accountant.[10] The court stated that it would not enter any order at that time, but that, during the examination of the plaintiffs at trial, if a relevant inquiry was made concerning his or her tax return, such witness could review their tax return to reply to the inquiry. The court stated, "I'm not ordering that [the tax returns] be disclosed at this time, but that does not mean that they will or will not be disclosed." The court noted, as well, that the case was scheduled for trial and that this matter could have been resolved at an earlier time.

The parties revisited the issue again on the penultimate day of the trial when the defendant's attorney renewed his motion for sanctions related to the plaintiffs' failure to disclose tax returns. The defendant's attorney reminded the court that the plaintiffs' attorney had represented that he had reviewed the plaintiffs' tax returns and that the court had indicated that, the plaintiffs, during their testimony, would have access to their tax returns. The defendant's attorney observed that, during their testimony, many of the plaintiffs testified that they had not provided their tax returns to the plaintiffs' attorney. The defendant's attorney once again stated that the defendant was prejudiced by the fact that it was unable to submit the tax returns to an accountant for review.

The plaintiffs' attorney argued that the court already had considered the issue concerning tax returns and that the defendant's attempt to revisit this discovery issue was untimely. The plaintiffs' attorney observed that none of the plaintiffs testified at trial that he or she had obtained a "fraud or theft" tax loss related to

the defendant and that no plaintiff had testified at trial that he or she had reported any income from the bank on his or her tax return. The plaintiffs' attorney also argued that, even if a tax write-off due to theft or fraud had been taken, a later payment would necessitate a repayment for the write-off.

On the last day of trial, the court ruled on the issue of the tax returns, stating: "Should a plaintiff receive a monetary award in this case, the defendant may apply for an examination of the plaintiff's tax returns in order to see if the returns shed light on the person's having received a recovery in another lawsuit on the so-called [notes relating to the defendant].

"And I want to note that this ruling is made in the context of the earlier discovery in this case. There were three hearings before Judge Rush. At the time this [discovery] issue was first presented to me, which is June 29, [2016], the case had been assigned for trial by the presiding judge, and the presiding judge is rather firm on the trial assignment dates. This system falls apart if the trial dates are not met. And on [June 29, 2016] I realized that there were many witnesses in this case and [that] the witnesses had come from various parts of the country—the West Coast, Florida and . . . the New York and Connecticut area.

"And at that time I concluded [that] continuing the case was not a practical resolution. So . . . that's why I've come to the resolution that I have. So, that's the ruling on the motion for sanctions." The court did not sanction the plaintiffs.

In its analysis of the present claim, the defendant refers to the testimony of Mel Shulevitz and the plaintiffs Geoffrey M. Holmes, Lee M. Holzman, Daniel D. Gestwick, Paige Gist, and Geoffrey W. Holmes that they either had not provided their tax returns to the plaintiffs' attorney in the weeks prior to the trial or that they did not recall ever having provided their returns to him. The defendant then asserts in relevant part: "The trial court ruled that [the defendant] was entitled to the tax return information so [it] could establish and prove its affirmative defense of setoff. [The] plaintiffs' attorney intentionally did not provide the information and misled the court regarding the actions taken regarding this defense. It is clearly unjust, based upon these circumstances, not to remand this issue for further proceedings to allow [the defendant] to properly prove its affirmative defense of setoff."

As we have stated previously, there is no factual challenge to the court's finding that the defendant failed to present evidence in support of its defense of setoff. Although the defendant's claim is intertwined with its motion for sanctions against the plaintiffs, it does not challenge the court's failure to award sanctions or the court's ruling to permit the defendant to apply for

review of the tax returns following the judgment in the plaintiffs' favor. Instead, the defendant appears to raise a claim that was not raised at trial, namely, that the court could not properly consider the issue of setoff without first permitting *the defendant* to undertake a review of the plaintiffs' tax returns. And, presuming facts that were not found by the court, the defendant asks this court to remand the case for further proceedings. Specifically, the defendant urges this court to conclude that the plaintiffs' attorney intentionally misled the court with respect to his review of the tax returns pursuant to Judge Rush's ruling.

The record presented to this court, however, reflects that neither Judge Rush nor the trial court, *Hon. George N. Thim*, judge trial referee, were persuaded that the defendant was entitled to unfettered access to the tax returns. At no time did Judge Thim determine that anything improper had occurred with respect to the tax returns. Instead, the court deemed it sufficient to permit the defendant to "apply" for an examination of the tax returns following a judgment in favor or one or more plaintiffs. The defendant does not attempt to demonstrate that this relief is not adequate or that it pursued this potential relief made available to it. Moreover, the record reflects that the defendant had an ample opportunity to examine each of the plaintiffs who testified at trial concerning the issue of whether they had received any recovery related to the notes and subnotes at issue in this claim. Upon careful examination, however, no plaintiff testified that he had recovered from a collateral source. Under the circumstances, we are not persuaded that the court adjudicated the issue, which was presented to it on the eve of trial, in an unfair manner or that the defendant is entitled to the relief sought with respect to this claim.

C

Next, the defendant claims that the court erred by rejecting its special defense of judicial estoppel, which was based on the doctrine of unclean hands.[11] We disagree.

In its tenth special defense as to all counts, the defendant alleged: "The original payee of the note and/or his agents and/or assignees and/or the plaintiffs have unclean hands and, therefore, may not enforce the subject note." In its posttrial brief, the defendant argued in relevant part: "Assuming arguendo that any of the alleged assignments are valid, [the] plaintiffs are tainted with the fraud and misconduct of their predecessor in interest . . . who is currently incarcerated for his fraudulent behavior. Such behavior specifically relates to the transactions that form the subject of this lawsuit." Additionally, the defendant argued that the plaintiffs who testified at trial that they had been involved in the settlement of prior lawsuits that were brought against the bank should be precluded from seeking to rely on

the subnotes as being valid because, in the previous lawsuits, they had challenged the validity of the subnotes.

As we stated previously, the court rejected the special defense at issue, stating: "In the tenth special defense, [the defendant] alleges [that] the plaintiffs' claims must be barred on the theory [that] the plaintiffs are tainted by Tagliaferri's fraud. [The defendant] further argues that the plaintiffs must be barred because they asserted in other lawsuits that the 'subnotes' were invalid. Neither Tagliaferri's fraud nor the plaintiffs' claims in other lawsuits invalidates or bars the plaintiffs' present claims."

Next, we set forth some relevant principles of law. "[A]pplication of the doctrine of unclean hands rests within the sound discretion of the trial court. . . . The exercise of [such] equitable authority . . . is subject only to limited review on appeal. . . . The only issue on appeal is whether the trial court has acted unreasonably and in clear abuse of its discretion. . . . In determining whether the trial court abused its discretion, this court must make every reasonable presumption in favor of [the trial court's] action. . . . Whether the trial court properly interpreted the doctrine of unclean hands, however, is a legal question distinct from the trial court's discretionary decision whether to apply it. . . . Similarly, we have stated that [t]he question of whether the clean hands doctrine may be applied to the facts found by the court is a question of law. . . . We must therefore engage in a plenary review to determine whether the court's conclusions were legally and logically correct and whether they are supported by the facts appearing in the record. . . . The court's factual findings underlying the special defense of unclean hands, however, are reviewed pursuant to the clearly erroneous standard." (Citations omitted; internal quotation marks omitted.) *Monetary Funding Group, Inc.* v. *Pluchino*, 87 Conn. App. 401, 406, 867 A.2d 841 (2005).

"It is a fundamental principle of equity jurisprudence that for a complainant to show that he is entitled to the benefit of equity he must establish that he comes into court with clean hands. . . . The clean hands doctrine is applied not for the protection of the parties but for the protection of the court. . . . It is applied not by way of punishment but on considerations that make for the advancement of right and justice. . . . The doctrine of unclean hands expresses the principle that where a plaintiff seeks equitable relief, he must show that his conduct has been fair, equitable and honest as to the particular controversy in issue. . . . Unless the plaintiff's conduct is of such a character as to be condemned and pronounced wrongful by honest and fair-minded people, the doctrine of unclean hands does not apply. . . . The party seeking to invoke the clean hands doctrine to bar equitable relief must show that his oppo-

nent engaged in wilful misconduct with regard to the matter in litigation. . . . The trial court enjoys broad discretion in determining whether the promotion of public policy and the preservation of the courts' integrity dictate that the clean hands doctrine be invoked. . . . Wilful misconduct has been defined as intentional conduct designed to injure for which there is no just cause or excuse. . . . [Its] characteristic element is the design to injure either actually entertained or to be implied from the conduct and circumstances. . . . Not only the action producing the injury but the resulting injury also must be intentional." (Citations omitted; internal quotation marks omitted.) *U.S. Bank National Assn.* v. *Eichten*, 184 Conn. App. 727, 747, 196 A.3d 328 (2018).

The defendant relies heavily on *Dougan* v. *Dougan*, 301 Conn. 361, 21 A.3d 791 (2011), for the proposition that judicial estoppel bars the plaintiffs who participated in the prior lawsuits from obtaining equitable relief. Thus, a brief discussion of *Dougan* is necessary. The plaintiff in *Dougan* testified at the trial for the dissolution of his marriage to the defendant that he considered fair and equitable the terms of a stipulation for judgment that the parties had presented to the court. Id., 364. The trial court found that the stipulation for judgment was fair and equitable, and it incorporated the stipulation for judgment by reference into its judgment dissolving the parties' marriage. Id., 365.

After the judgment was rendered, however, the plaintiff failed to comply with the judgment in that he failed to pay the defendant interest in accordance with the terms of the judgment. Id. At a hearing on a motion for enforcement that had been brought by the defendant, the plaintiff, contrary to the position he advanced at the time of the trial, argued that the interest provisions of the stipulated judgment were invalid and unenforceable as against public policy. Id., 371–72. The trial court agreed with the plaintiff, and it did not enforce the interest provisions. Id., 365–66. Following an appeal by the defendant, the Appellate Court reversed the judgment of the trial court and remanded the case to the trial court for further proceedings. Id., 366–67.

Following a grant of certification to appeal from the judgment of the Appellate Court, our Supreme Court in *Dougan* affirmed the judgment of the Appellate Court after determining that an alternative ground for affirmance sounding in judicial estoppel supported the enforcement of the interest provisions at issue. Id., 374. In relevant part, the court explained, "[t]ypically, judicial estoppel will apply if: [1] a party's later position is clearly inconsistent with its earlier position; [2] the party's former position has been adopted in some way by the court in the earlier proceeding; and [3] the party asserting the two positions would derive an unfair advantage against the party seeking estoppel. . . . We

further limit judicial estoppel to situations where the risk of inconsistent results with its impact on judicial integrity is certain. . . . Thus, courts generally will not apply the doctrine if the first statement or omission was the result of a good faith mistake . . . or an unintentional error." (Internal quotation marks omitted.) Id., 372–73. Our Supreme Court explained that, in light of the evidence that, at the time of trial, the plaintiff understood the interest provisions, the stipulation for judgment was the product of lengthy negotiations between the parties, the parties had been represented by experienced attorneys, the parties testified that they were familiar with and agreed with the terms in the stipulation for judgment, and the plaintiff was " 'a highly educated and financially sophisticated party' "; id., 374; the facts of the case satisfied the conditions for the application of the doctrine of the judicial estoppel to preclude the plaintiff from seeking to render the interest provisions unenforceable. Id., 373–74.

In light of its reliance on *Dougan*, we interpret the defendant's claim as a challenge to the plaintiffs' right to recover damages against it because, in prior lawsuits, the plaintiffs challenged the validity of the assignments and subnotes generated by Tagliaferri during his fraudulent course of conduct. As is reflected in the court's findings, which are unchallenged and set forth previously in this opinion, the court found that Tagliaferri engaged in fraud in connection with the assignment of the promissory note that had been executed in favor of Szulik and with respect to the subnotes involving the defendant that were recorded in the plaintiffs' accounts at the bank. The court also made findings, which are likewise unchallenged, concerning the nature of the claims that the plaintiffs advanced in the prior lawsuits on which the defendant relies in the present claim.

It is important to emphasize that the court did not find, and the defendant does not suggest, that the defendant was a party in the prior lawsuits. Moreover, we emphasize that the court expressly rejected the plaintiffs' claim in the present action that they were entitled to damages as *assignees* of the notes or subnotes at issue in the present litigation. Instead, the court provided a remedy to the plaintiffs under the equitable theory of unjust enrichment, a cause of action that did not depend on the existence of valid assignments to the plaintiffs. To the extent that the defendant argues that the plaintiffs should not recover under the claims raised in the present action because they took inconsistent legal positions in the prior lawsuits (by arguing that the notes and subnotes were invalid) and in the present action (by arguing that they were entitled to recover as assignees under the notes and subnotes), such an unclean hands defense logically and legally pertains to the assignee cause of action that the court expressly rejected.

On this record, the defendant is unable to demonstrate that, with respect to the unjust enrichment claim under which the plaintiffs recovered damages, which is necessarily based on the theory that the defendant unjustly benefited from the funds fraudulently taken from them, the plaintiffs took an inconsistent legal position in the prior lawsuits that was adopted by a court in an earlier proceeding to the detriment of the defendant. The defendant does not draw our attention to any evidence, let alone a finding, that it was the subject of a prior lawsuit or that the issue of its having benefited from the plaintiffs' funds was a subject of a prior lawsuit. Instead, as the court found, in the prior lawsuits the plaintiffs claimed that Tagliaferri had engaged in fraud in connection with the assignments and the subnotes and stated claims against the bank, not the defendant, for what they claimed was misconduct on the part of the bank. The defendant has not demonstrated that claims of this nature either explicitly or implicitly suggested that the defendant had not been unjustly enriched by means of Tagliaferri's fraudulent conduct or the bank's misconduct. Stated otherwise, the defendant has failed to point to any inconsistency in the plaintiffs' positions in prior lawsuits and the present action that affected the equitable claim on which they prevailed.

In light of the foregoing, we conclude that the defendant has failed to demonstrate that the court abused its discretion in rejecting the unclean hands special defense.

### D

Next, the defendant claims that the court erred by finding that the note executed by the defendant in favor of Szulik had been amended. We disagree.

As we stated previously in this opinion, the court found that in July, 2006, Tagliaferri negotiated a loan for the defendant, the source of which was Szulik's investment account with the bank. Tagliaferri negotiated the loan with the defendant's chief executive officer, Muscato. Thereafter, Muscato signed a promissory note dated July 25, 2006, the terms of which obligated the defendant to pay Szulik the principal amount of $2,050,000 on April 24, 2007. The note also provided for prepayment of interest. In accordance with the terms of the note, $1,865,500 was advanced from Szulik's account with the bank. At the defendant's direction, the loan proceeds were forwarded to an escrow account.

The court also found in relevant part: "In August of 2007, the note was extended to February 23, 2010. [The defendant] paid an extension fee of $205,000 and, in addition, paid $45,000 for interest that had accrued between the original due date, April 24, 2007, and the date of the fee payment.

"According to Tagliaferri, the [defendant's] note was

amended by a document dated April 24, 2007. The purported amendment changed the section on interest and repayment of principal. The purported amendment requires [the defendant] to 'pay [i]nterest on the [p]rincipal accruing on and after April 24, 2007, on the first day of each month commencing on July 1, 2007 until the [o]bligations are paid in full.' The typed document has lines for the signatures for . . . Muscato on behalf of [the defendant] and . . . Tagliaferri on behalf of TAG as agent for Szulik. The copy in evidence is not signed. . . . Muscato, as of the date of his deposition on August 14, 2015, had never seen the document amending the note and was not aware the note had been amended." (Citation omitted.) In its decision, the court referred to the copy of the amendment in evidence as part of trial exhibit 3, which is a transcript of Tagliaferri's deposition testimony as well as several exhibits marked during the deposition. The court admitted some, but not all, of the deposition exhibits that are part of the exhibit. In this instance, the court referred to deposition exhibit 8, which is attached to trial exhibit 3.

As the defendant correctly observes, the court's reference to exhibit 8 from *Tagliaferri*'s deposition was in error because that exhibit 8 is not the amendment at issue. Rather, the amendment at issue was marked as exhibit 8 during *Muscato*'s deposition. A transcript of Muscato's deposition testimony as well as several exhibits marked during the deposition later were admitted into evidence as trial exhibit 1. The court admitted some, but not all, of the deposition exhibits that are part of the exhibit. The defendant accurately argues that, if the court relied on exhibit 8 from Muscato's deposition, however, such reliance was improper because, although the court admitted Muscato's deposition, it excluded some of the exhibits attached to Muscato's deposition, including exhibit 8. In the absence of the court's reliance on this document, which was not part of the evidence, the defendant asserts, there was no basis in the evidence to support the court's finding that the note had been amended.

"[W]e will upset a factual determination of the trial court only if it is clearly erroneous. The trial court's findings are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . We cannot retry the facts or pass on the credibility of the witnesses. A finding is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Surrells* v. *Belinkie*, 95 Conn. App. 764, 767, 898 A.2d 232 (2006).

The defendant's claim is not persuasive for two reasons. First, although the court erroneously referred to

the written amendment as being deposition exhibit 8 from Tagliaferri's deposition, the written amendment at issue, in fact, was part of the evidence because it was marked as deposition exhibit 5 from Tagliaferri's deposition. There is no basis to presume that the court relied on deposition exhibit 8 from Muscato's deposition, as the defendant suggests. Moreover, during his deposition, Tagliaferri testified that Muscato had negotiated the terms of the amendment with him and that he believed that, at some point, it was executed by Muscato, on behalf of the defendant, and himself, as president of TAG Virgin Islands, Inc. Thus, there was an evidentiary basis for the court's factual finding concerning the written amendment, and the defendant has not demonstrated that it was clearly erroneous.

Second, even if there was no evidence to support the court's finding, the defendant, as the appellant, is unable to obtain relief unless it can demonstrate that the improper finding was harmful. "An appellant bears the burden of demonstrating that a court's erroneous finding was harmful because it likely affected the result." *Bueno* v. *Firgeleski*, 180 Conn. App. 384, 404, 183 A.3d 1176 (2018). The plaintiffs argue, and we agree, that the court's finding with respect to the assignment was not integral to its analysis under a theory of unjust enrichment. To the extent that the defendant's attempts to extend its payment obligations were relevant to a determination that the defendant was aware of the existence of the note and its obligations thereunder, there was evidence before the court that, in 2010, Muscato was aware of the note and wrote in an e-mail to Tagliaferri that the defendant would not default. Accordingly, we reject the defendant's claim.

E

Next, the defendant claims that the court erred by finding that the defendant had been unjustly enriched as a result of Tagliaferri's use of the plaintiffs' funds. We disagree.

The court made many subordinate findings of fact relevant to the funds removed from the plaintiffs' custodial investment accounts at the bank in exchange for purported ownership interests in the promissory note that the defendant executed in favor of Szulik in 2006. The court also found that the defendant obtained the loan from Szulik so that it could assist IQL in obtaining computer equipment.[12] The defendant borrowed $2,050,000 from Szulik and, after the prepayment of interest in accordance with the July 25, 2006 promissory note, $1,865,500 was advanced from Szulik's bank account. After the defendant experienced business difficulties, the note was extended to February 23, 2010. The defendant paid an extension fee as well as accrued interest for this extension of the note.

The court also found that, in 2009 and 2010, Tagliaf-

erri directed the bank to wire funds from the plaintiffs' accounts at the bank to an escrow account maintained by TAG's attorney as payment for the defendant's notes or the subnotes created by Tagliaferri. Consistent with this purpose, the bank recorded asset values in each of the accounts at issue for notes or subnotes in an amount equal to the funds taken from the accounts at Tagliaferri's direction. As a group, the plaintiffs paid TAG $1,848,000 for the defendant's subnotes. The defendant, however, acknowledges that it has not made any payment on the original note since April, 2007.

As we stated previously, the court found: "To the extent [that] the plaintiffs rely on an unjust enrichment claim, this court finds the issues in favor of the plaintiffs. The evidence, including a portion of Tagliaferri's deposition testimony that this court credits, is that [the defendant's] obligation to Szulik was satisfied with Tagliaferri's use of the plaintiffs' funds. The plaintiffs, as a group, paid $1,848,000 on [the defendant's] obligation to Szulik. . . . Despite demand, as evidenced by the plaintiffs' lawsuit filed in Oregon on July 24, 2012, [the] defendant . . . has failed to pay the plaintiffs, to their detriment."

In the present claim, the defendant argues that the court erred in its finding that it was unjustly enriched by the plaintiffs for several reasons. The defendant argues that there was no evidence that the defendant "benefited by the disbursement of money from [the plaintiffs'] accounts." Also, the defendant argues that it was not unjust for the defendant not to pay the plaintiffs for any benefit. According to the defendant, any assignment of the note entered into between Szulik and the defendant after July, 2009, was the product of Tagliaferri's fraud and, thus, the subject transactions (assignment of subnotes to the plaintiffs by Tagliaferri) were invalid. The defendant also argues that, on their face, the subnotes required the defendant to repay funds to TAG, not to the plaintiffs. Finally, the defendant argues that the plaintiffs did not prove that the defendant's failure to pay on the note was to the detriment of the plaintiffs. According to the defendant, the plaintiffs merely proved that Tagliaferri stole the funds at issue from their accounts but failed to prove where the funds were directed after they were deposited in TAG's trust account.

Before addressing the merits of this claim, we set forth some relevant legal principles related to unjust enrichment. "A right of recovery under the doctrine of unjust enrichment is essentially equitable, its basis being that in a given situation it is contrary to equity and good conscience for one to retain a benefit which has come to him at the expense of another. . . . With no other test than what, under a given set of circumstances, is just or unjust, equitable or inequitable, conscionable or unconscionable, it becomes necessary in

any case where the benefit of the doctrine is claimed, to examine the circumstances and the conduct of the parties and apply this standard. . . . Unjust enrichment is, consistent with the principles of equity, a broad and flexible remedy. . . . Plaintiffs seeking recovery for unjust enrichment must prove (1) that the defendants were benefited, (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiffs' detriment. . . .

"This doctrine is based upon the principle that one should not be permitted unjustly to enrich himself at the expense of another but should be required to make restitution of or for property received, retained or appropriated. . . . The question is: Did [the party liable], to the detriment of someone else, obtain something of value to which [the party liable] was not entitled? . . .

"Although we ordinarily engage in a deferential review of the trial court's conclusion that the defendant was unjustly enriched . . . a claim that the equitable remedy of unjust enrichment is unavailable as a matter of law raises a question of law subject to plenary review." (Citations omitted; footnote omitted; internal quotation marks omitted.) *Horner* v. *Bagnell*, 324 Conn. 695, 707–708, 154 A.3d 975 (2017).

"Unjust enrichment is a common-law doctrine that provides restitution, or the payment of money, when justice so requires. . . . Recovery is proper if the defendant was [benefited], the defendant did not pay for the benefit and the failure of payment operated to the detriment of the plaintiff. . . . In the absence of a benefit to the defendant, there can be no liability in restitution; nor can the measure of liability in restitution exceed the measure of the defendant's enrichment. . . . These requirements for recovery of restitution are purely factual. . . .

"Unjust enrichment is a doctrine allowing damages for restitution, that is, the restoration to a party of money, services or goods of which he or she was deprived that benefited another." (Citations omitted; internal quotation marks omitted.) *Piccolo* v. *American Auto Sales, LLC*, 195 Conn. App. 486, 494, 225 A.3d 961 (2020).

The evidence reflects, and it is not in dispute, that the defendant, through Muscato, executed the promissory note for $2,050,000 in Szulik's favor. During his deposition testimony, which was admitted into evidence, Muscato testified that he signed the promissory note at issue as the chief executive officer of the defendant. Muscato testified that the defendant planned to use the proceeds of the note to further its business, specifically, to purchase "hardware" for a data center in Antigua. He testified that the hardware was purchased, paid for, and used by the defendant. Muscato testified that he

assumed that, under the terms of the note, Szulik had paid the defendant $1,865,500, but the defendant did not make any payments on the loan.

Muscato testified that, when he became aware that the note was due in 2007, he knew that the defendant was unable to pay Szulik. At that time, however, he attempted to extend the note under terms that "made sense" for the defendant. Muscato testified that, after the defendant defaulted on the loan in 2010, he did not dispute this fact with Tagliaferri.

Tagliaferri's deposition testimony, which was admitted into evidence, shed light on the nature of the transactions at issue. Tagliaferri testified with respect to his role and the role of TAG in the note and subnotes at issue. He testified that neither the assignments nor the subnotes were "fictitious securities . . . ." Importantly, Tagliaferri testified that the loan proceeds that had been paid to the defendant were repaid to Szulik by a number of TAG clients, including the plaintiffs. Tagliaferri testified that Muscato was aware of the fact that Szulik had been repaid, in large part, by means of the plaintiffs' funds.[13] Tagliaferri testified that each of his clients, the plaintiffs, to whom he assigned portions of the original note, had a custody account agreement with the bank, and that the creation of the subnotes and the transmission of the corresponding funds to Szulik were done pursuant to each plaintiff's investment account agreement with TAG and their custody account agreements with the bank. After Tagliaferro reviewed information concerning the subnotes at issue, the plaintiffs' attorney examined him as follows:

"Q. . . . [D]id you have conversations with [Muscato] regarding the payment of these individual subnotes by the various individuals who were your clients? . . .

"A. Yes, not each of them individually, but certainly we discussed the repayment of the principal and the interest on the subnotes, yes. I didn't specifically go over the $40,000 for this client or $100,000 for that client. We were talking about the payment of the note, the total amount of the note, which, I think, was $2,050,000, and the interest due on that note, yes.

"Q. Now, in your conversations with [Muscato], did you refer . . . him to the fact that there were assignments made of the original note to [Szulik]?

"A. Yes. . . .

"Q. And did you discuss with him whether [Szulik's] original obligation had been paid? . . .

"A. Yes. . . .

"Q. . . . In what manner was [Szulik] paid?

"A. Well . . . [Muscato] was aware that . . . [Szulik] had been paid in full, and all the accrued inter-

est had been paid [by] the assignees of the note and that the assignees of the note were entitled to the interest from a certain date plus the principal. . . . I told him by telephone.

"Q. Was there ever an occasion when [Muscato], on behalf of [the defendant], denied that there was any further obligation on [the defendant's] part for the payment of the sums owing to the assignees? . . .

"A. No, there was not."

Also, Tagliaferri testified: "The specific conversations I had with [Muscato] took place in the first half of 2010, including, I think, by mid-2010, and during those conversations he acknowledged that the note was due, was outstanding, and he was going to make payment shortly . . . . [T]o the best of my recollection, he has not made payment."

Describing the effect of the assignment of the original note and the language in the subnotes that required the defendant to repay TAG, Tagliaferri explained: "[T]he subnote speaks for itself. The obligation on the part of [the defendant], the $2,050,000 note, plus it accrues interest, is the note that [the defendant] executed in 2007. It was assigned to [the plaintiffs], and the instrument that was given to all the [plaintiffs] was the subnote. The fact is very clear [that the defendant] owes $2,050,000 plus accrued interest to all the assignees of the note, whoever they might be, subnote or no subnote."

Tagliaferri also testified: "I can . . . tell you with certainty that the [loan] funds were disbursed from the Szulik account, that is, the $1,865,500 [was] disbursed from the Szulik account, and the Szulik account received in its custody account at [the bank] a [note executed by the defendant] with a principal amount of $2,050,000. And, of course, we know that there was payment subsequent to that made. I mean, clearly, [the defendant] made a forbearance payment or a note extension payment of $205,000. It also made an additional interest payment of $45,000. . . .

"How do I know that the funds were disbursed and that the note was received in the account? Because I looked at it over and over again, and I also know that the $205,000 note extension agreement or forbearance payment was made. It shows up right in the schedule there. There was an additional $45,000 in interest paid . . . and [the defendant], by making those payments, clearly . . . knew that it had to make these payments. It was no question that the $1,865,500 got to [the defendant]. It got there. What wasn't paid was the $2,050,000, and the interest wasn't paid, and that is why they paid the forbearance payment, and that is why they paid the interest. That is clear."

It suffices to observe that, in addition to the deposition testimony of Muscato and Tagliaferri, evidence

reflecting the subnotes acquired by the plaintiffs consisted of business records related to the plaintiffs' accounts at the bank. These records, admitted as exhibits 4 and 8, reflect that funds left the plaintiffs' accounts in 2009 and 2010, as described by Tagliaferri, and that their accounts thereafter stated their interest in the subnotes at issue in this action.

The defendant argues that it was not benefited. In this argument, the defendant focuses on the trial testimony of several of the plaintiffs that reflected that they lacked personal knowledge of how the funds deducted from their accounts at the bank, at Tagliaferri's direction, ultimately were used. According to the defendant, "no evidence was produced by [the plaintiffs] establishing that Szulik received any payments from [the plaintiffs] whatsoever." The problem with this aspect of the defendant's claim, however, is that it seemingly overlooks Tagliaferri's testimony that, at the time of the purchase of the subnotes by the plaintiffs and others, Szulik was repaid in full. Tagliaferri testified that this was made clear to Muscato as well. Muscato testified that the defendant benefited from the loan that it obtained from Szulik in that the defendant purchased hardware with those loan proceeds. It hardly requires explanation that the repayment of the defendant's loan obligation to Szulik with the plaintiffs' funds constituted a benefit to the defendant.

Another argument raised by the defendant is that the plaintiffs failed to prove that the defendant *unjustly* did not pay the plaintiffs for the benefit that it received. In this aspect of the claim, the defendant challenges the legal validity of the assignment by which TAG obtained an interest in the original note. The defendant argues: "[The plaintiffs'] claims are all based on the foundation that Tagliaferri 'justly' obtained an interest in the note. The undeniable evidence is that Tagliaferri committed fraud, the subject transactions were not valid, and Tagliaferri is in prison for a pattern of similar fraudulent conduct." Moreover, the defendant points to the evidence that, in prior lawsuits brought by the plaintiffs against the bank and/or Tagliaferri, the plaintiffs argued that the subnotes were fraudulent. The defendant argues that the plaintiffs did not justly obtain an interest in the original note, the subnotes did not obligate the defendant to make direct payment to the plaintiffs but to TAG, and that the plaintiffs cannot rely on the subnotes, which are "nothing more than IOU's from TAG," to enforce the note. The defendant's argument in this regard is not persuasive because the court did not award the plaintiffs a remedy in this action as legal assignees and subrogees, but under the equitable doctrine of unjust enrichment. If we were to follow the defendant's logic, the result would be untenable, for it would lead to the conclusion that an equitable remedy is unavailable to a plaintiff who lacks a legal remedy.

The defendant also argues that the plaintiffs failed to prove that the failure of payment was to their detriment. According to the defendant, "[the plaintiffs] produced no evidence whatsoever as to where any of the funds removed from their various accounts went after either being wired to [TAG attorney] Barry Feiner's trust account or being wired to other parties' accounts. Further, the [bank] statements of Szulik showed no funds transferred into his account, let alone any funds in amounts and dates alleged by Tagliaferri. In short, [the plaintiffs] failed to show [that] their funds were anything other than stolen by Tagliaferri . . . ." We observe that Szulik was not called as a witness in the present action, nor was deposition testimony from Szulik offered into evidence. Nonetheless, in making this argument, the defendant seemingly overlooks Tagliaferri's testimony, set forth previously in this opinion, that the proceeds of the original note, plus interest, were repaid to Szulik, in part, by virtue of the funds deducted from the plaintiffs' accounts, over which TAG exercised control.[14]

In light of the foregoing, we conclude that the defendant has failed to demonstrate that the evidence did not support the court's finding that the plaintiffs were entitled to recover under a theory of unjust enrichment.

F

Next, the defendant claims that the court erred by finding that cross-traded subnotes, which had been exchanged between some of the plaintiffs' accounts, had unjustly enriched the defendant. We decline to reach the merits of this claim, as it is inadequately briefed.

As set forth previously in this opinion, the court found that, at Tagliaferri's direction, the bank wired funds from the plaintiffs' accounts to an escrow account maintained by TAG. Bank records reflect the funds that were removed from the plaintiffs' accounts as well as the fact that the funds were disbursed for subnotes of the defendant. The court stated in relevant part: "The bank recorded asset values in each account for [the defendant's] notes or subnotes in an amount equal to the amount transferred from the accounts at Tagliaferri's direction. Some accounts had more than one transaction with respect to the [defendant's] notes. A review of the transactions also indicates that there was some cross-trading of the 'subnotes' between the plaintiffs' accounts."

In the present claim, the defendant focuses on evidence of Tagliaferri's cross-trading of subnotes. The defendant refers to bank records showing that, in December, 2009, Tagliaferri sold $640,000 of a $725,000 subnote that was held by one of the plaintiffs, the Katz Marital Trust, to ten other plaintiffs in this action.

The defendant states in its brief that such cross-trad-

ing is illegal and that "[t]here is nothing legitimate about . . . any of these subnotes." After discussing this evidence, the defendant baldly states: "Accordingly, the trial court was clearly erroneous in finding that [the plaintiffs to whom the cross-traded subnotes were assigned] paid any portion of [the defendant's] obligation to Szulik." In its brief, the defendant has provided this court with a one sentence conclusory statement of this claim that is unsupported by any analysis, let alone any citation to authority. Insofar as the reasoning that underlies the defendant's claim is not readily apparent, we observe that this court is not an advocate and will not formulate a rationale on the defendant's behalf. See, e.g., *LaBow* v. *LaBow*, 85 Conn. App. 746, 751–52, 858 A.2d 882 (2004) ("[a]s we have stated on occasions too numerous to recite, mere abstract assertions, unaccompanied by reasoned analysis, will not suffice to apprise a court adequately of the precise nature of a claim"), cert. denied, 273 Conn. 906, 868 A.2d 747 (2005). Accordingly, the defendant has not demonstrated that the fact that cross-trading occurred undermined the court's finding that funds removed from the plaintiffs' accounts at issue had been used to repay the defendant's debt to Szulik, as Tagliaferri so clearly testified during his deposition. See part I E of this opinion.

G

Next, the defendant claims that the court erred by finding that the defendant's loan obligation to Szulik was satisfied in part with the use of the plaintiffs' funds. We disagree.

The following additional facts are relevant to the present claim. In the portion of the court's memorandum of decision rejecting the plaintiffs' claim that they were entitled to legal relief *as assignees*, the court found in relevant part: "To the extent [that] the plaintiffs rely on the contention that they are assignees of the [defendant's] note, this court finds the issues in favor of the defendant . . . . The assignment claims are dependent on the veracity of Tagliaferri and the reliability of records kept by him while he was committing financial fraud. The 'assignment' documents were created for and signed solely by Tagliaferri. Tagliaferri, as discussed [previously], was recently convicted of felonies involving such a degree of turpitude in their commission that one cannot readily accept his version of events. Indeed, some of the plaintiffs, in recent lawsuits, attacked his veracity and described the transactions in their accounts as fake and created out of whole cloth." As we have discussed previously in this opinion, the court, however, awarded the plaintiffs relief with respect to their *equitable* claim for relief.

The present claim of error is the defendant's attempt to challenge the court's reliance on *any* portion of Tagliaferri's deposition testimony. As we have discussed in detail in part I E of this opinion, the testimony was

admitted into evidence and, among other things, it demonstrated that Tagliaferri used the plaintiffs' funds to satisfy the debt that the defendant owed Szulik pursuant to the 2006 note that the defendant executed in Szulik's favor. The defendant, acknowledging that Tagliaferri's deposition testimony was, in fact, evidence that the plaintiffs' funds were used to satisfy its debt to Szulik, nonetheless urges this court to conclude that the trial court could not rely on the testimony to reach that finding. The defendant argues that, "after acknowledging that one cannot readily accept Tagliaferri's version of events, the trial court astonishingly relied on his implausible deposition testimony to establish that [the defendant's] obligation to Szulik was satisfied with Tagliaferri's use of the [plaintiffs'] funds."

We note that, in the context of this factual claim, the defendant raises what it deems to be "technical" defects in the manner in which Tagliaferri's deposition occurred. For instance, the defendant argues that Tagliaferri, who was deposed by telephone while he was incarcerated, was not properly put under oath prior to the start of the deposition and that nobody was present to verify what documents he reviewed during his testimony. Moreover, the defendant, drawing our attention to excerpts from the deposition, which is 107 pages in length, describes his testimony as "vague," "inexact," and "hazy," thereby appearing to suggest that the testimony *in its entirety* had no evidentiary value whatsoever. Despite these arguments, in this appeal, the defendant has not set forth a claim of evidentiary error with respect to the admission of Tagliaferri's deposition and does not analyze the claim as one of evidentiary error.[15] Instead, the defendant couches its claim in terms of factual error and, specifically, a challenge to the court's reliance on the evidence at issue, which, we note, was admitted without limitation.[16] At the heart of the defendant's claim is its argument that "Tagliaferri's testimony was simply not credible."

"Appellate review under the clearly erroneous standard is a two-pronged inquiry: [W]e first determine whether there is evidence to support the finding. If not, the finding is clearly erroneous. Even if there is evidence to support it, however, a finding is clearly erroneous if in view of the evidence and pleadings in the whole record [this court] is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *T & M Building Co.* v. *Hastings*, 194 Conn. App. 532, 539, 221 A.3d 857 (2019), cert. denied, 334 Conn. 926, 224 A.3d 162 (2020).

Tagliaferri's testimony supports the challenged finding. Moreover, we are not persuaded, in view of the evidence and pleadings in the whole record, that a mistake has been committed. "In a case tried before a court, the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific

testimony. . . . It is within the province of the trial court, as the fact finder, to weigh the evidence presented and determine the credibility and effect to be given the evidence." (Internal quotation marks omitted.) *Schaeppi* v. *Unifund CCR Partners*, 161 Conn. App. 33, 43, 127 A.3d 304, cert. denied, 320 Conn. 909, 128 A.3d 953 (2015). "It is the quintessential function of the fact finder to reject or accept certain evidence . . . . As the trier of fact, the trial court may properly accept or reject, in whole or in part, certain testimony offered by a party." (Citation omitted; internal quotation marks omitted.) *In re Antonio M.*, 56 Conn. App. 534, 540, 744 A.2d 915 (2000). The court was entitled to rely on Tagliaferri's deposition testimony in whole or in part. The defendant has not demonstrated that the court drew improper inferences from or misconstrued that testimony.

The defendant also suggests that the court's finding was clearly erroneous because the court, in rejecting the claim that the plaintiffs were assignees, stated that it would not credit Tagliaferri's "version of events," yet it relied on his testimony in support of the plaintiffs' claim for relief under a theory of unjust enrichment. We are not persuaded that any inconsistency exists. To prove that they are legal assignees of the subnotes at issue, the plaintiffs were bound to demonstrate the legal validity of those instruments, which, as the court found, were the product of Tagliaferri's fraud. To prove that they were entitled to equitable relief, however, the plaintiffs did not have to prove that the instruments at issue had legal validity but that they were entitled to repayment because their funds had been used to partially satisfy the defendant's debt to Szulik. The court was free to reject the portions of Tagliaferri's testimony that would have supported the assignee claim while relying on those portions of his testimony that supported the claim for equitable relief. In light of the foregoing, the defendant has failed to demonstrate that the court's findings were clearly erroneous.

H

Finally, the defendant claims that the court erred by finding that the plaintiffs had satisfied the defendant's debt obligation to Szulik despite the fact that the debt was not discharged pursuant to the terms of the note at issue. We disagree.

The promissory note executed by Muscato, as chief executive officer, on behalf of the defendant on July 25, 2006, provides in relevant part: "No modification or waiver of any of the provisions of this [n]ote shall be effective unless in writing and signed by [p]ayee and only then to the extent set forth in such writing, or shall any such modification or waiver be applicable except in the specific instance for which it is given. This [n]ote may not be discharged orally but only in writing duly executed by [p]ayee."[17] Relying on this

portion of the original note, the defendant argues in relevant part: "In addition to the fact that [the plaintiffs] produced no credible evidence establishing that Szulik was paid any of the moneys taken from the [plaintiffs'] accounts, [the plaintiffs] failed to produce any writing, duly executed by Szulik, discharging [the defendant's] debt obligation pursuant to the note." The defendant argues that the plaintiffs failed to sustain their burden of proof by failing to present such evidence.

As we stated previously in this opinion, "[p]laintiffs seeking recovery for unjust enrichment must prove (1) that the defendants were benefited, (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiffs' detriment." (Internal quotation marks omitted.) *Horner* v. *Bagnell*, supra, 324 Conn. 708. The defendant does not cite to any authority that stands for the proposition that the plaintiffs bore the *additional* burden of proving that the benefit that they conferred on the defendant by means of repayment of the debt thereafter caused Szulik to discharge the note in writing. For the reasons already discussed in this opinion, the evidence, including Tagliaferri's deposition testimony, supported a finding that the plaintiffs' funds were used to pay the debt that the defendant owed to Szulik. The fact that the plaintiffs did not demonstrate that repayment of the debt satisfied the technical requirements of a note to which they were not a party is of no consequence to our analysis of whether funds removed from their accounts at the bank benefited the defendant. Accordingly, the court did not err in finding that the plaintiffs were entitled to recover under a theory of unjust enrichment despite the failure to produce evidence of a written discharge of the note.

## II

### THE PLAINTIFFS' APPEAL

In the present appeal from the court's denial of the plaintiffs' motion for attorney's fees and expenses, the plaintiffs claim that the court erred by denying their motion for attorney's fees and expenses after rendering judgment in their favor with respect to their unjust enrichment cause of action. We disagree.

The following additional procedural history is necessary to our analysis of the present claim. In December, 2016, after the court's judgment in favor of the plaintiffs with respect to their unjust enrichment claim, the plaintiffs filed a motion in which they requested (1) an award of attorney's fees and expenses they incurred during the trial, and (2) "that the consideration of the attorney's fees issue be bifurcated so that liability is determined before the calculation of fees and expenses is considered." With respect to their motion for attorney's fees, the plaintiffs argued that, under the terms of the original promissory note that the defendant executed in Szulik's

favor in 2006, such a remedy was available to Szulik in the event that the defendant defaulted on the note by failing to make payment when due. Relying on paragraph 7 (b) of the note,[18] the plaintiffs argued "that, by purchasing interests in [the note] they paid [the defendant's] obligation under it, became equitable assignees, subrogees, of [Szulik's] interest in the note and were entitled to all legal rights held by [Szulik] against [the defendant]. As such, they were entitled to seek payment of the note by its maker, [the defendant], plus attorney's fees and costs of collection."

The defendant objected to the plaintiffs' motion for attorney's fees on the ground that, under the American rule, attorney's fees generally are disallowed unless they are provided to the prevailing party by contract or statute. The defendant argued that, although the plaintiffs were attempting to claim a right to such fees as assignees of the note, the court had expressly rejected their assertion of rights as assignees of the note and had awarded them damages under their equitable cause of action only. The defendant argued that the court did not find that the plaintiffs had been equitably subrogated into "the shoes of . . . Szulik" with respect to the note. Moreover, the defendant argued that the facts of this case did not support such relief because "it is undisputed that [the] plaintiffs' total contributions, as a group, did not satisfy the entire debt obligation reflected in the original [defendant's] note." The defendant also argued that the plaintiffs did not rely on a statutory ground for attorney's fees or assert that a departure from the American rule was warranted in the present case.

The plaintiffs filed a reply in which they argued, in part, that the court had not made any determinations with respect to their rights under the doctrine of "equitable subrogation" or "equitable assignment" because it had not been asked to do so until the plaintiffs filed the motion for attorney's fees. Moreover, in responding to the arguments raised by the defendant, the plaintiffs did not dispute the defendant's reliance on the fact that, the funds of the plaintiffs, as a group, did not repay the entire debt. Instead, they argued that the defendant had failed to demonstrate that this fact was legally significant with respect to their claim for equitable subrogation.

On January 25, 2017, Judge Thim issued an order stating that he had considered the parties' filings and then summarily denied the plaintiffs' motion for attorney's fees.

Thereafter, the plaintiffs filed a motion for reargument in which they reasserted their legal argument that, because they had discharged a portion of the defendant's obligation under the note, they had been subrogated to the position of Szulik with respect to the note. The plaintiffs argued that, to the extent that the defen-

dant argued that equitable subrogation was not a proper remedy because the plaintiffs' funds had not satisfied the entire debt, such an argument was waived because it was not raised at the time of trial.

The defendant filed an objection related thereto. The defendant argued in relevant part: "In this case, there is no guarantee, note, or any other written document running from [the defendant] to any of the plaintiffs that authorizes the recovery of attorney's fees. The court specifically found in favor of [the defendant] on the assignment claims and only found for the plaintiffs on the unjust enrichment claim. The decision contains no finding whatsoever that any plaintiffs established any claims for subrogation, and it is undisputed [that] the plaintiffs' contributions, as a group, did not satisfy the entire debt obligation. Therefore, there is no basis whatsoever for [the] plaintiffs to 'step into the shoes' of [Szulik] under the . . . note."

The plaintiffs filed a reply in which they disagreed with the defendant's argument that a claim for subrogation was not part of the action because equitable subrogation claims had been stricken by the court, *Sommer*, *J.*, prior to trial. The plaintiffs argued that the argument advanced by the defendant was flawed because, as a matter of law, subrogation is a proper remedy for a claim of unjust enrichment and, thus, need not have been specifically alleged apart from its unjust enrichment claim.

In its May 3, 2017 order denying the plaintiffs' motion for reargument, the court stated in relevant part: "This court denies the plaintiffs' motion to reargue their postjudgment motion for attorney's fees . . . . This court initially denied the plaintiffs' motion for attorney's fees on the ground [that] the defendant, in articulating its objection to the motion, had incorrectly interpreted this court's memorandum of decision dated November 23, 2016, wherein this court stated the following: 'To the extent [that] the plaintiffs rely on the contention [that] they are assignees of the [defendant's] note, this court finds the issues in favor of the defendant . . . .' The plaintiffs claim they have acquired by assignment or subrogation a contractual right under the terms of the [defendant's] note to recover attorney's fees. This assertion is contrary to the court's finding with respect to the assignment claim. The plaintiffs did not obtain a contractual or quasi-contractual right to recover attorney's fees. The 'American rule' is that attorney's fees are not allowed to the successful party absent a contractual or statutory exception. . . . There is no contractual or statutory basis for a recovery of legal fees. Furthermore, there is no evidence of bad faith to justify a deviation from the American rule."[19] (Citations omitted.)

In the present claim, the plaintiffs advance arguments similar in nature to the arguments that they raised

before the trial court. Essentially, they argue that, by virtue of the fact that they were entitled to relief under a theory of unjust enrichment, they were entitled as a matter of right to be awarded attorney's fees and expenses as equitable subrogees. They argue that, by virtue of their funds having been used to pay the defendant's indebtedness, they stand "in the shoes" of Szulik with respect to the rights set forth in the note. They urge us to conclude that, "[o]nce unjust enrichment has been determined, as here, the remedy of equitable subrogation follows . . . ." The plaintiffs reason that, if the defendant was obligated to pay Szulik directly, an award of attorney's fees and expenses would have been Szulik's right, and it would unjustly enrich the defendant if it was not ordered to pay an award of attorney's fees and expenses to them. The plaintiffs also argue: "As a matter of equity, the plaintiffs should be subrogated to the Szulik right to recover attorney's fees and costs. The defendant should not be permitted to choose what subrogated obligations it will pay."

"Ordinarily, we review the trial court's decision to award attorney's fees for abuse of discretion. . . . This standard applies to the amount of fees awarded . . . and also to the trial court's determination of the factual predicate justifying the award. . . . When, however, a damages award is challenged on the basis of a question of law, our review is plenary." (Citation omitted; internal quotation marks omitted.) *Chicago Title Ins. Co.* v. *Accurate Title Searches, Inc.*, 173 Conn. App. 463, 496, 164 A.3d 682 (2017). "The trial court's determination of the proper legal standard in any given case is a question of law subject to our plenary review." (Internal quotation marks omitted.) *Total Recycling Services of Connecticut, Inc.* v. *Connecticut Oil Recycling Services, LLC*, 308 Conn. 312, 326, 63 A.3d 896 (2013). The issue presented does not implicate an amount of attorney's fees awarded or whether there was a factual predicate justifying such an award. Instead, the issue before us is whether, as the plaintiffs argue, they were entitled as a matter of right to be awarded attorney's fees and expenses as equitable subrogees. With respect to this question of law, we will exercise plenary review.

"The general rule of law known as the American rule is that attorney's fees and ordinary expenses and burdens of litigation are not allowed to the successful party absent a contractual or statutory exception. . . . Connecticut adheres to the American rule. . . . There are few exceptions. For example, a specific contractual term may provide for the recovery of attorney's fees and costs . . . or a statute may confer such rights. . . . This court also has recognized a bad faith exception to the American rule, which permits a court to award attorney's fees to the prevailing party on the basis of bad faith conduct of the other party or the other party's attorney." (Internal quotation marks omitted.) *ACMAT Corp.* v. *Greater New York Mutual Ins. Co.*, 282 Conn.

576, 582, 923 A.2d 697 (2007).

To the extent that the plaintiffs suggest in their analysis that, as a matter of law, a right of equitable subrogation emanates from the fact that they prevailed in their equitable cause of action sounding in unjust enrichment, the plaintiffs have failed to demonstrate that the law so requires. The plaintiffs have cited no binding authority in support of their claim that attorney's fees are a necessary component of an award in which a party has unjustly enriched another by payment of a debt.[20] "The law has recognized two types of subrogation: conventional; and legal or equitable. . . . Conventional subrogation can take effect only by agreement and has been said to be synonymous with assignment. It occurs where one having no interest or any relation to the matter pays the debt of another, and by agreement is entitled to the rights and securities of the creditor so paid. . . . By contrast, [t]he right of [legal or equitable] subrogation is not a matter of contract; it does not arise from any contractual relationship between the parties, but takes place as a matter of equity, with or without an agreement to that effect. . . . The object of [legal or equitable] subrogation is the prevention of injustice. It is designed to promote and to accomplish justice, and is the mode which equity adopts to compel the ultimate payment of a debt by one who, in justice, equity, and good conscience, should pay it. . . . As now applied, the doctrine of [legal or] equitable subrogation is broad enough to include every instance in which one person, not acting as a mere volunteer or intruder, pays a debt for which another is primarily liable, and which in equity and good conscience should have been discharged by the latter." (Citations omitted; footnote omitted; internal quotation marks omitted.) *Westchester Fire Ins. Co.* v. *Allstate Ins. Co.*, 236 Conn. 362, 370–71, 672 A.2d 939 (1996). In other words, "[a] party advancing properly a claim of equitable subrogation is stepping into the shoes of the party *it paid* in order to recover the payments *that it made* . . . ." (Emphasis altered; internal quotation marks omitted.) *Warning Lights & Scaffold Service, Inc.* v. *O & G Industries, Inc.*, 102 Conn. App. 267, 275, 925 A.2d 359 (2007).

The dispositive factor in our review is that the court expressly determined that the plaintiffs were entitled to recover under an unjust enrichment theory, but the court did not find that the plaintiffs were assignees of the original note that the defendant executed in Szulik's favor in 2006. Had the plaintiffs been assignees of the note, they could have sought to enforce the note, including the provision for payment of attorney's fees and expenses. The court, however, clearly drew a distinction between finding that the elements of the unjust enrichment cause of action had been proven and finding that the plaintiffs had stepped into the shoes of Szulik as a result of their partial payment of the defendant's debt. The court found that the plaintiffs were entitled

to a recovery for their payment of a portion of the debt owed to Szulik but did not find that they had obtained contractual or quasi-contractual rights to enforce the terms of the note against the defendant.

Moreover, as the defendant argued both before the trial court and this court, there is another impediment to the plaintiffs' argument that they are entitled to the relief of equitable subrogation. The court found, the evidence reflects, and the plaintiffs do not dispute, that Tagliaferri did not use the plaintiffs' funds to repay the entire debt that the defendant owed Szulik. Indeed, before this court, the plaintiffs assert that, as a group, their funds repaid $1,848,000 of that debt.[21] See footnote 4 of this opinion. As a general rule, "[e]quitable subrogation requires the subrogee to discharge *the entire debt* held by the original obligor." (Emphasis added.) 73 Am. Jur. 2d, Subrogation § 25 n.1 (2012). "Generally, a person is not entitled to be subrogated to the rights of another until the claim of the creditor against the debtor has been paid in full; this antisubrogation rule is known as the 'made whole doctrine.' *Part payment will not create a right of subrogation.* Until the debt is paid in full, there can be no interference with the creditor's rights or securities that might, even by a bare possibility, prejudice or in any way embarrass him in the collection of the residue of his debt." (Emphasis added; footnotes omitted.) Id., § 25. Although some evidence before the court suggested that the entire debt was paid at the time that Tagliaferri used the plaintiffs' funds to satisfy a large portion of that debt, the court's findings, to which we must defer unless they are successfully challenged on appeal, reflect that the funds of the plaintiffs and Lamm satisfied $1,848,000 of the defendant's debt obligation; the court did not find that the *entire* debt had been paid in full by the plaintiffs.

Accordingly, the court properly applied the American rule and determined that, in the absence of a contractual or statutory basis to award attorney's fees, and in the absence of an allegation of bad faith, the plaintiffs' motion for such fees should be denied. The plaintiffs have failed to demonstrate that the ruling was legally erroneous.

The judgment is reversed with respect to Douglas Lamm and the case is remanded with direction to vacate the judgment as to Douglas Lamm only; the judgment is affirmed in all other respects, and the denial of the plaintiffs' motion for attorney's fees is affirmed.

In this opinion the other judges concurred.

* The listing of judges reflects their seniority status on this court as of the date of oral argument.

[1] The plaintiffs are Indoor Billboard Northwest, Inc.; Catherine E. Cox; Daniel D. Gestwick IRA R/O; Paige C. Gist; Bernice Goldin IRA by Rochelle Goldin for Bernice Goldin Estate; Bernice Goldin IRA by Steve Goldin for Bernice Goldin Estate; Donald J. Handal Revocable Trust U/O; Donald J. Handal IRA R/O; Margot S. Handal TR U/A; Edward J. Harnett; Geoffrey M. Holmes; Geoffrey W. Holmes; Lee M. Holzman; Becky Holzman; Marital Trust U/W William Katz; Peggy W. Kaufmann IRA; Richard J. Kauffmann

Decedent's Trust; Kay M. Kazmaier; Stanley A. Star; James Shulevitz; Alan Wolff; Nadine Wolff; and Michael Wolff.

[2] This amount includes damages awarded to Douglas Lamm, who was neither a plaintiff in the underlying action nor a nonparty who had assigned his interest to a plaintiff in the underlying action. In part I A of this opinion, we will consider the merits of a claim brought by the defendant with respect to this portion of the judgment.

[3] The evidence reflects that the bank is headquartered in Quincy, Massachusetts.

[4] We emphasize that the court's findings reflect that Tagliaferri did not use the funds of the plaintiffs, as a group, to pay the entire debt that the defendant owed Szulik. The court found that, after the prepayment of interest in the amount of $184,500 was deducted from the $2,050,000 loan, $1,865,500 was advanced to the defendant from Szulik's account in 2006. In 2007, the defendant paid an extension fee of $205,000 and an interest payment of $45,000, but the defendant did not make any payment on the $1,865,500 principal of the loan. The court found that the funds of the plaintiffs and Lamm were used to pay only $1,848,000 of the unpaid debt.

[5] In a subsequent articulation filed May 14, 2019, the court provided additional justification for its decision in relevant part: "The court's award to the plaintiffs was based on an unjust enrichment theory. As this court noted in its memorandum of decision, '[the defendant's] obligation to Szulik was satisfied with Tagliaferri's use of the plaintiffs' funds.' The court did not accept the plaintiffs' assignment theory. [The] plaintiffs did not obtain a legal or equitable right to enforce the contractual provisions of the note or other documents. The court, on this issue, chose not to rely [on] the deposition testimony of . . . Tagliaferri, a convicted felon who, at the time of the trial in the present case, was serving a prison sentence for his having committed financial crimes. When this court referred in its memorandum [of decision] to the plaintiffs' assignment claim as 'purported' assignment, the court meant to convey to the reader that the court had concluded that all the assignment claims were unproven allegations.

"The court did not find that the exhibits bearing the dates February 24, 2009, and November 26, 2009, are, in fact, assignments. All of the plaintiffs' assignment claims are based on Tagliaferri's testimony and/or documents created and kept by Tagliaferri while he was committing financial fraud. As the court noted, some of the plaintiffs in this case described Tagliaferri's transactions as fake and created out of whole cloth."

[6] In response to a motion for articulation brought by the defendant, the court discussed four additional special defenses (seventeen, eighteen, nineteen, and twenty) that were expressly applied to all counts of the operative complaint and which were set forth in an amended answer and special defenses filed by the defendant on October 15, 2015, to which there was no reply. The seventeenth special defense stated: "[The] plaintiffs' claims of assignment of the subject note are barred by lack of bargained for consideration." The eighteenth special defense stated: "[The] plaintiffs' claims are barred by the [fact] that no plaintiff is currently in possession of the original subject note, and the original subject note is lost." The nineteenth special defense stated: "[The] defendant is entitled to a setoff to the extent of all [moneys] received by or on behalf of [the] plaintiffs from any collateral source, including but not limited to, any settlement or court-ordered criminal restitution." The twentieth special defense stated: "[The] plaintiffs' claims are barred to the extent [that] the subnotes upon which they rely to support their claims are not unconditional promises to pay, are not signed by the original payee or [the defendant] and are mere promises to pay made by [the] plaintiffs' purported assignor . . . Tagliaferri, on behalf of [TAG]."

In its articulation, the court set forth its rationale for rejecting these additional four special defenses that it did not expressly address in its November 23, 2016 memorandum of decision. The court stated in relevant part: "The defendant did not discuss or rely upon the seventeenth and eighteenth special defenses in its posttrial briefs. In light of the facts set forth in the court's memorandum of decision, the seventeenth and eighteenth special defenses are without merit. In the nineteenth special defense, the defendant claims it has a right to setoff from collateral sources. There was, however, no evidence that any settlement funds received in connection with other lawsuits were allocated to the [defendant's] subnotes. In the twentieth special defense, the defendant asserts [that] the subnotes were not signed by the original payee or [the defendant]. In light of the fact [that] this court found the issues in favor of the plaintiffs on the unjust enrichment claim, rather than the assignment claim, this defense is inapplicable."

[7] The court awarded Catherine E. Cox $33,750; Daniel D. Gestwick IRA R/O $33,750; Paige C. Gist $33,750; Bernice Goldin IRA $20,250, Donald J. Handal Rev Trust U/O, Donald J. Handal IRA, R/O & Margot S. Handal Tr U/A $182,250; Edward J. Hartnett $87,750; Geoffrey M. Holmes $33,750; Geoffrey W. Holmes $168,750; Lee M. Holzman and Becky Holzman $67,500; Indoor Billboard Northwest, Inc., $189,000; Assigned Claims of Joy S. Kertes and Ronald Kertes $33,750, Gail N. Kuhn $101,250, and Douglas Lamm $135,000; Marital Trust U/W William Katz $506,250; Peggy W. Kaufmann IRA and Richard J. Kaufmann Decedent's Trust $170,100; Kay M. Kazmaier $27,000; James Shulevitz $135,000; Stanley A. Star $232,200; Alan Wolff and Nadine Wolff $135,000; and Michael Wolff $168,750.

[8] We will discuss the procedural history related to the plaintiffs' motion as well as the court's ruling denying the motion in part II of this opinion.

[9] We note that, although the defendant relies on what transpired before Judge Rush on May 13, 2016, including the court's ruling, it did not provide this court with the transcript of the proceeding of that date. Instead, in the appendix to its brief, the defendant has submitted a single page from the transcript of the proceeding on May 13, 2016, the accuracy of which is not disputed by the plaintiffs. To the extent that the parties disagree about the specific manner in which Judge Rush resolved the tax return issue, we are unable, on the basis of the record before us, to verify the substance of that ruling beyond relying on what is set forth on the single page of the transcript that is in the record.

[10] The plaintiffs' attorney informed the court that he had "some" of the plaintiffs' tax returns nearby.

[11] In its brief, the defendant couches the present claim in terms of the court's having failed "to consider" its special defense. Because, as the defendant acknowledges in its analysis of the claim, the court, in its memorandum of decision, plainly discussed the special defense, we consider the claim to be whether the court properly rejected the special defense.

[12] The evidence was not in dispute, and the court found, that, as of the date of the loan, Muscato, the chief executive officer of the defendant, was the president of IQL.

[13] Tagliaferri testified that, in July, 2009, Szulik began the process of terminating his relationship with TAG. TAG continued to manage some of Szulik's assets until early 2010. Szulik's interest in the defendant's note was one of the assets that Szulik asked TAG to continue to manage until Szulik fully terminated his relationship with TAG.

[14] In this portion of its claim, the defendant also suggests that the equitable remedy of subrogation is available only if a party bringing an action can demonstrate that an implied contract or quasi-contractual relationship exists between itself and the party against whom the equitable remedy is sought. The defendant argues: "There were no contractual or quasi-contractual relationships at all between [the defendant] and the plaintiffs which could support a valid claim for recovery under an unjust enrichment theory." The defendant has not cited any authority that limits the equitable remedy in this manner, and our review of relevant precedent does not burden a plaintiff seeking recovery under a theory of unjust enrichment to demonstrate that something akin to a contractual relationship exists between itself and a defendant. As our Supreme Court has stated: "A right of recovery under the doctrine of unjust enrichment is essentially equitable, its basis being that in a given situation it is contrary to equity and good conscience for one to retain a benefit which has come to him at the expense of another. . . . With no other test than what, under a given set of circumstances, is just or unjust, equitable or inequitable, conscionable or unconscionable, it becomes necessary in any case where the benefit of the doctrine is claimed, to examine the circumstances and the conduct of the parties and apply this standard. . . . Unjust enrichment is, consistent with the principles of equity, a broad and flexible remedy. . . . Plaintiffs seeking recovery for unjust enrichment must prove (1) that the defendants were benefited, (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiffs' detriment." (Citations omitted; internal quotation marks omitted.) *Hartford Whalers Hockey Club* v. *Uniroyal Goodrich Tire Co.*, 231 Conn. 276, 282–83, 649 A.2d 518 (1994).

[15] Accordingly, we need not address the plaintiffs' argument that, if the claim is viewed as one of evidentiary error, it is unreviewable on appeal because it is unpreserved.

[16] The defendant framed this claim as follows: "Did the trial court *err in finding* [that] [t]he evidence, including a part of Tagliaferri's deposition testimony that this court credits, is that [the defendant's] obligation to Szulik

was satisfied with Tagliaferri's use of [the] plaintiffs' funds?" (Emphasis added; internal quotation marks omitted.)

[17] In the note, Szulik was identified as the "payee."

[18] Paragraph 7 (b) provides in relevant part: "Upon the occurrence of an [e]vent of [d]efault . . . all [o]bligations then remaining unpaid hereunder shall immediately become due and payable in full, plus interest on the unpaid portion of the [o]bligations at the highest rate permitted by applicable law, without notice to [m]aker and without presentment, demand, protest or notice of protest, all of which are hereby waived by [m]aker together with all reasonable costs and expenses of the collection and enforcement of this [n]ote, including reasonable attorney's fees and expenses, all of which shall be added to the amount due under this [n]ote."

[19] In a subsequent articulation filed May 14, 2019, the court provided the following additional rationale concerning its ruling with respect to attorney's fees: "The plaintiffs contend [that] their claim for counsel fees was previously ruled upon by another judge in a pretrial proceeding in this case. The law of the case doctrine is not a limitation on a trial court's powers. . . . This court found that there was no privity of contract. Further, this court found that the plaintiffs failed to show that this court should exercise equitable powers and impose on [the defendant] an obligation to pay legal fees." (Citation omitted.)

[20] The plaintiffs rely on the decision of a federal District Court in *Seabright Ins. Co.* v. *Matson Terminals, Inc.*, 828 F. Supp. 2d 1177 (D. Haw. 2011), which we do not find to be persuasive authority. It suffices to observe that *Seabright Ins. Co.* is factually distinguishable in that the plaintiff in that case, an insurer, sought to recover attorney's fees from the defendant that it paid on behalf of its insured in connection with a workers' compensation action. Id., 1179. In denying a motion for summary judgment, the court reasoned that the claim for attorney's fees by the plaintiff was dependent on its ability to enforce rights codified in an insurance contract that had been entered into by its insured. Id., 1192. In the context of a claim that *an insurer* is entitled to the right of subrogation, the court observed: "The right of subrogation is derivative. An insurer entitled to subrogation is in the same position as an assignee of the insured's claim, and succeeds only to the rights of the insured. The subrogated insurer is said to stand in the shoes of its insured, because it has no greater rights than the insured and is subject to the same defenses assertable against the insured. Thus, an insurer cannot acquire by subrogation anything to which the insured has no rights, and may claim no rights which the insured does not have." (Internal quotation marks omitted.) Id.

[21] This amount includes Lamm's contribution, if any, to the payment of the debt. As we determined in part I A of this opinion, Lamm's interest was not properly before the trial court.

---